[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10565

_____

D.C. Docket No. 1:14-cv-00285-WBH

RICHARD L. SEALEY,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 31, 2020)

Before JORDAN, JILL PRYOR, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

In 2002, Richard Sealey was convicted of murdering John and Fannie Mae

Tubner with an axe and sentenced to death.  After unsuccessfully pursuing post-

conviction relief in Georgia state court, Sealey filed a federal petition for a writ of

habeas corpus under 28 U.S.C. § 2254.  The district court denied relief.

Sealey was granted a certificate of appealability on four issues: (1) whether his counsel rendered ineffective assistance by failing to investigate mitigating evidence at sentencing; (2) whether the trial court denied him due process and a fair trial by refusing his request for a one-day continuance; (3) whether the jury's verdict was unconstitutional or in violation of Georgia's sentencing scheme; and (4) whether he was denied his right to self-representation under *Faretta v. California*, 422 U.S. 806 (1975).

We hold that the state habeas court's decision as to Sealey's ineffective-assistance-of-trial-counsel claim was neither contrary to nor an unreasonable application of federal law nor based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). We also conclude that we are barred from considering Sealey's other claims because he failed to raise them on direct appeal and cannot show "cause" and "prejudice" to overcome the default. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). We therefore affirm the district court's denial of Sealey's petition.

## I

### A

In the evening of January 23, 2000, Richard Sealey, Wajaka Battiste, Gregory Fahie, and Deandrea Carter drove to the home of Carter's grandparents—John and Fannie Mae Tubner. *Sealey v. State*, 593 S.E.2d 335, 337 (Ga. 2004).

The plan was for Sealey to keep the Tubners occupied while Carter tried to get money from them.  When the four arrived at the Tubners' home, Sealey, Carter, and Fahie went inside while Battiste waited for them in his car.  *Id.*  Fahie, who testified against Sealey in exchange for a plea bargain, explained that he, Sealey, and Carter visited with the Tubners for 20 to 30 minutes.  At that point, Fahie went to use the restroom; while he was doing so, Carter knocked on the door and said that Sealey was "tripping."  *Id.*  When Fahie exited the bathroom, Mr. Tubner was bleeding on the living room floor, and Sealey was holding Mrs. Tubner down while brandishing Mr. Tubner's handgun.  *Id.*  Sealey then dragged Mrs. Tubner, who was bound with duct tape, to a bedroom upstairs.  *Id.*  Fahie testified that Sealey told him to look for money in the house, but he didn't find any.  *Id.*

When no money was found, Sealey instructed Carter to heat a fireplace poker, which he used to torture Mrs. Tubner into telling them where she and her husband kept their money.  *Id.*  Sealey then asked Carter to bring him a hammer so that he could kill Mr. and Mrs. Tubner, and Carter brought him an axe.  *Id.*  Sealey repeatedly struck Mrs. Tubner's head with the axe, and "then went downstairs and did the same to Mr. Tubner, who had crawled a short distance across the living room."  *Id.*

According to Battiste, when Sealey, Carter, and Fahie returned to Battiste's car, Sealey told Fahie that he "had to do it" because the Tubners had mistreated

3

Carter and her mother and because "they seen our face." Sealey also told Battiste

not to drive fast and that he had a gun. Sealey and Carter directed Battiste back to

Sealey's motel. Before getting out of the car, Sealey told Battiste "you have never

seen me" and "I'll out your lights," which Battiste took to mean that Sealey would

hurt him.

## B

## 1

Sealey was indicted by a Georgia grand jury on two counts of murder,

fourteen counts of felony murder, two counts of possession of a firearm during the

commission of a crime, and one count of possession of a firearm by a convicted

felon.

John Beall was appointed to defend Sealey, and Beall chose Joseph

Roberto to be his second chair.[1] As part of their sentencing-phase investigation,

Beall, Roberto, and Jodi Monogue, a paralegal in Roberto's office, traveled to the

island of St. Croix in the U.S. Virgin Islands, where Sealey was raised, to gather

information about his background. The team went to Sealey's childhood home and

the prison where he had spent time as a juvenile, and they also visited and

requested records from the local hospital and police station. They tried to track

---

[1] The state habeas court acknowledged that Beall and Roberto both had experience with capital cases. It stated that Beall had tried four death penalty cases and that Roberto had been the second chair on two cases before Sealey's.

4

down Sealey's baseball coach and speech therapist, but they were unsuccessful. When they attempted to obtain Sealey's school records, the principal initially refused to provide them, despite having a release from Sealey. After Sealey's team pressed the issue, the principal told them that a "hurricane blew [the records] all away." Records produced during state habeas proceedings show that while in St. Croix, the team held strategy meetings to prepare for trial.

The defense team met with Sealey's half-sister, Pauline Corbitt, and two of his nephews, Ronald Tutein and Kareem Dennis, during the St. Croix trip. According to Sealey, "[a]ll three family members" whom the defense team interviewed in St. Croix "indicated that they were willing to testify on Sealey's behalf."[2] Roberto testified to the contrary: "[W]e had no one to come forward and say a damn thing about Richard that was good, not one person. Not his mother, not his sister. There were no friends. There was nobody."

Beall and Roberto also conducted a preliminary investigation into potentially mitigating mental-health evidence by having Sealey meet with Dr. Jack Farrar, a clinical and forensic psychologist. Dr. Farrar testified at the state habeas

---

[2] In an affidavit submitted to the state habeas court, Pauline Corbitt stated that she had told Sealey's attorneys that she would come testify at Sealey's trial but that, when they called her to come, it was on such short notice that she couldn't adjust her schedule. She stated that she "would've come to Atlanta to beg for [her] little brother's life if [she] had been given an opportunity." Ronald Tutein also submitted an affidavit stating that he told Sealey's lawyers that he would come to testify on Sealey's behalf. Kareem Dennis' affidavit states that, although Sealey's lawyers may have wanted him to be a character witness, he was never contacted about it after the interview in St. Croix.

5

proceedings that, after meeting with Sealey, he told Beall that "in [his] opinion

there was something very, very wrong with" Sealey and that he likely "suffered

from some kind of delusional, paranoid kind of disorder, perhaps even a psychoses,

and that certainly a neurological kind of process, an organic brain problem needed

to be evaluated." In response to Dr. Farrar's initial evaluation, Beall requested

funds from the trial court for a complete evaluation, stating that "based on what Dr.

Farrar said, Mr. Sealey needs two things: a full battery of psychological

evaluations and . . . if he finds evidence of organic injury he may need a

neurologist." Despite requesting—and, so far as we can tell, receiving—funding

from the court, the defense team never had Sealey fully evaluated.[3]

**2**

In the months and days leading up to Sealey's trial, the state trial court held

several hearings to address complaints that Sealey had lodged against his counsel.

The first hearing took place three months before trial, after Sealey sent a letter to

the state trial judge alleging that Beall and Roberto were ineffective—Beall for

failing to move to recuse a member of the district attorney's office and Roberto for

working only on the sentencing phase. At the hearing, counsel explained that they

---

[3] The state and Sealey disagree about why Dr. Farrar never conducted a full investigation. Transcripts show that on August 2, 2002—just ten days before trial—Beall told the trial court that Dr. Farrar had tried, but was unable, to meet with Sealey at the jail because of the jail's security policies. Dr. Farrar testified during the state habeas proceedings that he didn't remember being contacted by Beall regarding a follow-up examination.

were actively working on the recusal issue and that Roberto was focusing on the sentencing phase while Beall focused on the guilt phase. The court found no deficiency in Beall and Roberto's representation and denied Sealey's motion to remove them.

Ten days before trial, the state trial court held a hearing to address another request from Sealey that his counsel be removed. Sealey told the trial judge that there was a "major conflict" with Beall and Roberto.[4] Sealey was concerned that Beall had "given up all hope" in his case, citing a letter in which Beall had advised Sealey to accept the state's plea deal for life without parole.[5] Sealey said that he wanted to represent himself and proposed that another lawyer, Mike Mears, act as standby counsel, although Sealey wasn't sure that Mears would have adequate time to prepare. The court explained the dangers of self-representation and scheduled a *Faretta* hearing to take place four days later so that Sealey could consider the risks of proceeding without counsel.

---

[4] In addition to his concerns about a "conflict," Sealey also stated that Beall and Roberto failed to complete an investigation that he had requested (looking for a shoe on the roof of a store as possible evidence). Beall explained that the requested investigation had been completed, but nothing was found.

[5] In this letter, Beall stated that "[t]he primary defense to the case [was] no longer viable" because the district attorney had turned over to the defense a letter written by Sealey that implicated him "in a conspiracy to provide perjured testimony at trial." Beall warned Sealey that if he went to trial, the likely outcome would be the death penalty.

At that hearing—now six days before trial—Sealey reaffirmed that he wanted to represent himself with standby counsel, but he stated that he hadn't obtained new standby counsel and that having Beall or Roberto serve in that capacity would be a "conflict." The court decided that Sealey hadn't established "any legal grounds" for Beall and Roberto to be removed or for there to be a continuance to find new counsel. After conferring with Beall and Roberto, Sealey stated that he would "go ahead and have Mr. Beall and Mr. Roberto represent [him] as trial counsel," without waiving his rights as to the "conflict issue."

## C

### 1

At trial, the state's case largely consisted of testimony from Sealey's co-defendants and physical evidence. Battiste and Fahie testified against Sealey, relaying the facts of the murders as described above. The state also introduced Mr. Tubner's handgun, jewelry discovered in Sealey's motel room, and testimony regarding blood found on the floor and sink in Sealey's motel bathroom. *Sealey*, 593 S.E.2d at 337.

As for the defense, Beall described the guilt-phase strategy as rooted in sowing "residual doubt." Defense counsel attempted to show inconsistencies in the testimonies of Battiste and Fahie and argued that Sealey's co-defendants had a personal motive in testifying for the state. The defense also pointed to Sherry

8

Tubner—Mr. Tubner's daughter—as a possible suspect and questioned her about her knowledge of the murders. Counsel tried to introduce Sherry's polygraph results—which indicated that she had lied when she said she didn't know about or have any involvement in the murders—but the trial court ruled that the polygraph was inadmissible.

On Friday, August 23, 2002—for reasons that will become clear, the timing matters—the jury found Sealey guilty of both murders. After the verdict was read, the trial court excused the jurors for the weekend and instructed them that the sentencing phase of the trial would commence on Monday.

**2**

The sentencing phase began on Monday, August 26, with the state's aggravation case, which lasted less than one day. The state attempted to link Sealey to another crime—the murder of William Kerry—by showing that Sealey used Kerry's credit card the day Kerry was murdered. The state also presented testimony from Rossie Neubaum, who said that Sealey had raped her by threatening to "blow [her] brains out" unless she engaged in intercourse with him. Finally, several witnesses described Sealey's misconduct and violence in prison. Law enforcement officials and correctional officers testified that, among other things, Sealey had turned a spork into a shank and hidden razor blades, used a sock full of dominoes to attack another inmate, and come at officers in an aggressive

and threatening manner.  Defense counsel cross-examined each of the state's aggravation witnesses.

After the state rested its aggravation case on Monday, the defense was unprepared to present its case in mitigation.  Ronald Tutein—Sealey's nephew and the defense's sole mitigation witness—wasn't present to testify.  Defense counsel had arranged for Tutein, who lived in St. Croix, to arrive in time to testify on Wednesday, August 28.  Beall explained to the court that Tutein had a "medical appointment" because of a recent surgery on his knees, such that he was "not . . . able to leave last week in order to get here on time."  The defense requested a continuance until Wednesday to allow for Tutein's arrival.

The trial court denied the request.  It decided that there was "ample opportunity to have [Tutein] brought forward."  The court found that the issue wasn't brought to the court's attention until late on Monday and, further, that "[t]he defense was well aware that the exact day [Tutein] was needed might not be able to be ascertained and they might have to get [him] here a couple of days ahead of time."  The trial court did, though, grant an overnight continuance.  The court excused the jury and gave the defense until the next day so that Sealey and his counsel would have time to discuss whether Sealey would testify.

The defense presented its mitigation case on Tuesday, August 27.  According to Beall, the defense team's goal was "[t]o use residual doubt" and to

"humanize" Sealey in mitigation, but when asked about sentencing strategy during the state habeas proceedings, Roberto answered that "[t]here wasn't one." Counsel entered as exhibits (without any meaningful explanation) pictures of Sealey's childhood home and the ballfield that Sealey played on in St. Croix, as well as a few letters written by Sealey. No witnesses testified on Sealey's behalf, and Sealey decided not to take the stand.

In closing argument, the state emphasized Sealey's past crimes and wrongdoings, stressing that he would be a danger to others in prison if not sentenced to death. For its part, the defense attempted to cast doubt on the testimony of Fahie and Battiste, framing the issue for the jury as "whether or not Gregory Fahie is believable enough to execute Richard Sealey." Beall cited historical examples—Jesus, Socrates, Alfred Dreyfus, Jeffrey Dahmer, the Scottsboro Boys, and Charles Manson—seemingly in an effort to show the risk of the death penalty being imposed arbitrarily.

The jury rendered its verdict the same day. The jury recommended a death sentence after finding beyond a reasonable doubt that the following aggravating circumstances existed:

> [T]he murders were both outrageously or wantonly vile, horrible, or inhuman in that they involved the torture of the victims, depravity of mind, and the aggravated battery of the victims, that the murders were both committed for the purpose of receiving money or any other thing of monetary value, that the murder of Mr. Tubner was committed while Sealey was engaged in the capital felonies of armed robbery and

11

aggravated battery, and that the murder of Ms. Tubner was committed while Sealey was engaged in the capital felonies of armed robbery, aggravated battery, and kidnapping with bodily injury.

*Sealey*, 593 S.E.2d at 336–37 (citing Ga. Code Ann. § 17-10-30(b)(2), (4), and (7)).  The trial court imposed a single death sentence for the two murders.

### 3

Sealey appealed to the Georgia Supreme Court.  *Sealey*, 593 S.E.2d at 337. Because Sealey was still represented by the same lawyers, no ineffective-assistance-of-trial counsel claims were raised on direct appeal.  Nor did he present any of the other claims that he raises here—*i.e.*, those concerning the denial of a continuance during the sentencing phase, the jury's verdict, or his right to self-representation.  The Georgia Supreme Court affirmed Sealey's convictions and sentence.  *Id.*

## II

### A

Sealey filed a petition for a writ of habeas corpus in Georgia state court, challenging various aspects of the trial proceedings and his counsel's performance. As relevant to his claims here, he argued (1) that his trial counsel rendered ineffective assistance during the sentencing phase, (2) that the trial court erred in denying his motion for a continuance during the sentencing phase, (3) that the

jury's sentence and verdict violated constitutional and statutory requirements, and (4) that he was denied the right to represent himself under *Faretta*.

## 1

During the state habeas proceedings, Sealey and the state presented evidence regarding (a) Sealey's mental health, (b) trial counsel's failure to present Ronald Tutein at sentencing, (c) Sealey's family life, background, and future dangerousness, and (d) the decision of the jurors in his case to impose the death penalty.

## a

Both Sealey and the state put on mental-health experts who testified about their impressions of Sealey's background and their evaluations of him. Sealey presented Dr. Antonio Puente—an expert in neuropsychology. Based on an interview with Sealey's mother, Dr. Puente hypothesized that Sealey might have been a "blue baby"—that is, born with the umbilical cord wrapped around his neck such that he would have suffered from hypoxia, *i.e.*, a lack of oxygen—but he acknowledged that no medical records corroborated that hypothesis. As to Sealey's childhood, Dr. Puente testified that Sealey had a "chaotic upbringing" and that his life was "a series of . . . traumas"—from his problematic birth, to the separation of his parents, to his move to New York City as a pre-teen.

13

To evaluate Sealey's mental health, Dr. Puente administered 50 tests, giving about 15 of those tests twice to guard against "practice effect."  On one of the tests that Dr. Puente administered twice—the Wechsler Adult Intelligence Scale (WAIS)—Sealey obtained full-scale IQ scores of 75 and 79, which placed him between the fifth and eighth percentiles.  Dr. Puente concluded that Sealey suffered from "organic brain syndrome," which he said meant that "the brain is not working properly and something is happening to the individual's behavior or thinking."[6] He also noted that Sealey's prison records documented a "head injury" diagnosis, although he was unsure whether that diagnosis arose from psychological testing or from Sealey's self-reporting.  Dr. Puente further believed Sealey had "borderline mental retardation or intellectual functions" and "arrested development," meaning his maturity was equivalent to a 14- or 15-year-old's.

From a review of Sealey's background, test results, and personal interviews, Dr. Puente inferred that Sealey was unable to form plans, meaning that Sealey "could be easily swayed."  In Dr. Puente's view, Sealey's time in prison "contributed to his inability to develop a social compass or understanding on how the world worked," and when combined with pre-existing issues—such as "the

---

[6] Dr. Puente explained that "[t]echnically," under the Diagnostic and Statistical Manual of Mental Disorders, the diagnosis would be "dementia due to multiple ideologies [sic]," and under the International Classification of Diseases, "a diagnosis for head injury."  The term "organic brain syndrome," he said, was just "an old-fashioned word that captures the concept."

lack of appropriate parenting, maybe the head injury, maybe the perinatal injury, maybe the cannabis abuse"—Sealey's lengthy incarceration left him with a "highly impaired paradigm."

The state countered Dr. Puente's testimony by presenting Dr. Glen King, a forensic psychologist who had also evaluated Sealey. With respect to Sealey's background, Dr. King testified that Sealey "described [his father] . . . as very loving" and his mother as "very strict." Dr. King stated that Sealey "certainly indicated that he never felt physically abused by his parents" and didn't describe his childhood as chaotic. When investigating possible head injuries, Dr. King testified that Sealey told him that he couldn't recall ever being hospitalized or receiving a blow to the head that left him unconscious. Sealey's medical records also didn't indicate that he had experienced any symptoms from a serious head injury. On the question whether Sealey suffered from hypoxia, Dr. King testified that he "saw no evidence from Mr. Sealey that he has any cognitive deficits that would be explained by something like that." In other words, Sealey had "no motor problems" and "no sensory difficulties," and although "he had some differential abilities, in terms of his cognitive functioning, . . . it would not be consistent with what we would expect from hypoxia."

Dr. King also challenged Dr. Puente's administration of the WAIS. When asked about Dr. Puente administering the WAIS test twice, Dr. King stated that

"[i]n all my years of practice I've not seen it done before"—except, he said, to measure a patient's progress after a head injury—and that other tests exist to specifically test for malingering.  From reviewing the WAIS results, Dr. King also believed that "some of the questions . . . were, frankly, just not scored correctly." He stated that Dr. Puente evidently didn't ask follow-up questions when necessary that might have allowed Sealey to achieve higher scores and that Dr. Puente discontinued the testing too early.  This indicated to Dr. King "that [Dr. Puente did] not administer[] the test properly," and "it call[ed] . . . into question all of the results that [Dr. Puente had] obtained."  Dr. King observed that Sealey "generated a verbal comprehension index of 91" on the WAIS even though his math score was much lower.  Dr. King took this as a signal that Sealey had "low average functioning or average functioning"—not borderline intelligence—because "[t]he people who have true borderline intellectual functioning generate index and IQ scores that are all quite consistent and low."  But, all things considered, Dr. King stated that "the vast majority of [Dr. Puente's] test results appear to be pretty consistent, I think, with what I found and indicate normal functioning."  None of Dr. Puente's test results suggested to Dr. King that Sealey suffered from organic brain damage.

So too, Dr. King testified that the results of his own testing undermined Dr. Puente's diagnosis that Sealey had borderline intellectual functioning and organic

brain syndrome.  Because Dr. Puente had already administered the WAIS to Sealey twice, Dr. King testified that he couldn't also administer it due to "possible practice effects."  So, Dr. King administered the Stanford-Binet intelligence test and the Wide Range Achievement Test IV to evaluate Sealey's ability in reading, writing, arithmetic, and comprehension.  Dr. King scored Sealey's full-scale IQ at 82, which would be in the borderline-intelligence range, but he ultimately determined that Sealey functions in the low-average range (between 85 to 95) because half of the indices he obtained were in the borderline-intelligence range and half were in the average range.  Dr. King believed that Sealey may suffer from a learning disability in math because Sealey's "word reading, sentence comprehension, and spelling . . . occur at the tenth grade to college level," while Sealey's "math is at the sixth grade level."  Although some test results signaled to Dr. King that Sealey had a "poor processing speed," he testified that Sealey didn't have problems with "executive functioning" or frontal-lobe cognitive functions.  Overall, Dr. King concluded that Sealey's results didn't indicate either borderline intelligence or that Sealey was functioning at a teenage level.

In sum, Dr. King "found no evidence in any record nor in any testing that has been done or anything that [he had] done that indicates that [Sealey] is mentally retarded or functions in the borderline range" and that there was no "evidence whatsoever for any brain damage."  Dr. King testified that "Mr. Sealey

17

is certainly capable of planning, engaging in goal-directed behavior, listening to others and following their directions or giving directions to others" and that "[t]here's nothing that would indicate that he is . . . a follower all the time and lets everybody lead him around by the nose."

**b**

Some of the testimony and evidence at the state habeas hearing concerned trial counsel's failure to present Sealey's nephew, Ronald Tutein, at sentencing. Tutein testified that he didn't have a conflict that would have kept him from traveling to Georgia for Sealey's sentencing. Although he had recently had knee surgery, Tutein said that he was ready and willing to come testify on Sealey's behalf:

> Q[:]  Do you recall ever having a conversation with the attorneys for Richard Sealey where you told them that you couldn't come for a doctor's appointment or for any other reason?
>
> A [Tutein:]  No.  I made it clear that whenever they needed me they can call me, I'll be ready anytime.  I believe I was still on leave for my knee, so there was no conflict with my job.  I could leave as soon as they let me know.
>
> Q[:]  And were you ready, willing and able to come?
>
> A [Tutein:]  I was.  I was already packed when they called.
>
> …
>
> Q[:]  And would you have been willing to plead for his life?

18

A [Tutein:]  Yes, definitely.[7]

While he couldn't remember all the details, Roberto testified as follows: "[T]hat witness who I think was Tutein didn't make it because maybe we didn't have our act together and [get] him the plane ticket early enough or he couldn't really commit, and la-dah-dah.  It just, he wasn't there."  Beall testified that the defense "had planned on having live testimony, and at the very last minute that didn't happen."  Sealey also produced notes showing that Roberto's office called Tutein on Tuesday, August 27—the day Sealey was sentenced.  The notes stated: "prosecution ended one day early, not enough material to fill entire day, plane ticket bought, may come but . . . cannot testify as it will be too late."

As to the substance of Tutein's habeas testimony, he said that Sealey's voice was "loud and always laughing" and that Sealey once gave him advice not to fight with another person.  Tutein related similar information in an affidavit submitted to the state habeas court.  In that affidavit, Tutein also stated that Sealey would take him and his brother to play ball at the park, that Sealey tried "to discourage [him] and Kareem [Dennis] from going down the same path that he did," and that to him, Sealey "was not a violent or aggressive person."

---

[7] Tutein also stated in an affidavit that if Sealey's lawyers said that Tutein couldn't make it to testify because he had a follow-up appointment, "that is not true" and that he "would have been there no matter what."

19

**c**

Other witnesses testified about Sealey's family life, background, and future dangerousness.  Sealey presented James Aiken as an expert on the Virgin Islands prison system.  Aiken testified about the conditions that Sealey had likely faced while incarcerated as a juvenile in Anna's Hope and Golden Grove prisons: "Inmates were in control of other inmates," such that "[i]f you didn't fight, if you didn't act crazy, if you didn't inflict more violence on people, that violence will come to you."  Aiken said that the Virgin Islands prison system was "dysfunctional" and that inmates "were inflicting physical as well as emotional violence against other inmates," including "sexual misconduct."  Because "the political system turned their backs to this," he continued, "inmates had to fend for themselves."  Although he admitted that there were no records of Sealey being abused in prison, he stated that it wasn't uncommon for abuse or allegations of abuse to go unrecorded.  Aiken also testified as to Sealey's future dangerousness, stating that Sealey "could be adequately managed in a proper security level for the remainder of his life without causing undue risk of harm to staff and the inmates."

Sealey presented affidavit testimony from other witnesses, including his family members, elementary school teacher, baseball coach, and childhood friends.  Many hadn't seen or spoken to Sealey for several years but recalled some details about Sealey's childhood.  They testified that Sealey's mother and father didn't

20

actively parent him and that he was spoiled, that he struggled in school and had a stutter, and that he was a good athlete and popular. The affidavits also mentioned that Sealey had moved to New York with his mother as a pre-teen and had later returned to the Virgin Islands to live with his father, where he was given a BMW and left unsupervised. Several affiants recalled Sealey going to prison for a robbery and shooting that occurred in St. Croix.

### d

Finally, Sealey presented the testimony of several jurors from his trial. One juror, Monique Sheffield, testified in an affidavit that "[e]ven after all this time and even with the crime being so terrible I am on the fence about my decision for the death penalty." She also stated that

> some members of the jury, me included, were waiting for the defense to give us some reason not to give Richard Sealey the death penalty. I was surprised they didn't get just one relative, or a friend, or somebody, to get up and say, this person is somebody I care about, please don't kill him. I was waiting for somebody to say that and it would have made a difference to me.

Sheffield and other jurors also testified, as relevant here, that they would have considered information about Sealey's background—such as Sealey's mental health and experiences in prison—had it been presented at sentencing.

### 2

After considering all the testimony and evidence, the state habeas court denied Sealey's petition. With respect to Sealey's ineffective-assistance claim, the

21

court held that Sealey could not show both (1) that trial counsel were deficient in their investigation and presentation of mitigating evidence and (2) that any errors would have changed the outcome of Sealey's trial.  On Sealey's contention that the verdict and sentence were unconstitutional and in violation of Georgia statutes, the court denied the claim on the merits and, in the alternative, held that it was procedurally defaulted because Sealey failed to raise it at trial or on direct appeal. The court determined that the other claims that Sealey has presented here—that the trial court erred in denying his motion for a continuance and that he was denied the right to represent himself under *Faretta*—were procedurally defaulted.

Sealey filed a certificate of probable cause in the Georgia Supreme Court, which summarily denied review.  The United States Supreme Court then denied Sealey's petition for a writ of certiorari.  *Sealey v. Chatman*, 571 U.S. 1134 (2014).

**B**

Sealey next filed a petition for a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254, which the district court denied.  *Sealey v. Chatman*, No. 1:14-CV-0285-WBH, 2017 WL 11477455, at *39 (N.D. Ga. Nov. 9, 2017). Although the district court acknowledged that "at least at first blush," it "had grave concerns regarding the paucity of the case that trial counsel presented in mitigation," it ultimately denied Sealey's ineffective-assistance claims on the merits.  *Id.* at *7.  With respect to Sealey's argument that he was denied due

22

process and a fair trial when the state trial court denied his motion for a continuance, the district court held that this claim was procedurally defaulted and that Sealey hadn't shown cause and prejudice to overcome the default. *Id.* at *21. On Sealey's claims that the verdict was unconstitutionally arbitrary and that his right to self-representation was violated, the district court dismissed them as procedurally defaulted and, in the alternative, denied them on the merits. *Id.* at *20–23.

Sealey sought a certificate of appealability from the district court, which it granted on three issues: (1) whether Sealey's trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at sentencing; (2) whether the verdict was unconstitutionally arbitrary; and (3) whether Sealey was denied his right to represent himself under *Faretta*. Sealey asked this Court to expand the COA to include several additional claims. We initially denied Sealey's request but later granted his motion for reconsideration and expanded the COA to include his claim challenging the trial court's denial of the continuance during sentencing.

## III

"We review *de novo* the denial of a petition for a writ of habeas corpus." *Morrow v. Warden*, 886 F.3d 1138, 1146 (11th Cir. 2018) (quotation omitted). But the Antiterrorism and Effective Death Penalty Act of 1996 prescribes a deferential

23

framework for evaluating issues previously decided in state court. *Raulerson v. Warden*, 928 F.3d 987, 995 (11th Cir. 2019). Under AEDPA, a federal court may not grant habeas relief on claims that were "adjudicated on the merits in [s]tate court" unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d). The state court's factual determinations are presumed correct, absent clear and convincing evidence to the contrary. *Id.* § 2254(e)(1).

At issue here, primarily, is AEDPA's unreasonable-application-of-federal-law provision. The key word is "unreasonable," which is more than simply incorrect. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Williams v. Taylor*, 529 U.S. 362, 410–11 (2000). "[A] state court's application of federal law is unreasonable only if no fairminded jurist could agree with the state court's determination or conclusion." *Raulerson*, 928 F.3d at 995–96 (quotation omitted). This is "a difficult to meet and highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt." *Id.* at 996 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). We review "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011). Because

24

here the Georgia Supreme Court summarily denied Sealey's certificate for probable cause, we review the state trial court's habeas decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Raulerson*, 928 F.3d at 996 ("[W]e '"look through" the unexplained decision' of the Supreme Court of Georgia to review the superior court's decision as if it were the last state-court adjudication on the merits." (quoting *Wilson*, 138 S. Ct. at 1192)).

## IV

Sealey's appeal focuses primarily on whether the state habeas court's rejection of his ineffective-assistance claim constituted an unreasonable application of federal law under § 2254(d). The relevant federal law is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Premo v. Moore*, 562 U.S. 115, 121 (2011) ("The applicable federal law [for AEDPA purposes] consists of the rules for determining when a criminal defendant has received inadequate representation as defined in *Strickland*."). To prove ineffective assistance under *Strickland*, a defendant must show both (1) deficient performance of counsel and (2) resulting prejudice. 466 U.S. at 687.

When considering the deficiency prong, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As relevant to "counsel's duty to investigate"—a duty at issue in this case—"strategic choices made after less than

25

complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. While "[c]ounsel representing a capital defendant must conduct an adequate background investigation," we have held that "it need not be exhaustive." *Raulerson*, 928 F.3d at 997.

To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *id.*; *accord Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (en banc), which is a lesser showing than a preponderance of the evidence, *see Williams*, 529 U.S. at 405–06.  At the same time, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693.  In a capital case, the prejudice inquiry asks "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 695).  An ineffective-assistance claim can be decided on either the deficiency or

26

prejudice prong. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

While the *Strickland* standard is itself hard to meet, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id*. This means that "[s]o long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied." *Johnson*, 643 F.3d at 910.

Sealey asserts that his trial counsel—Beall and Roberto—rendered ineffective assistance at sentencing by failing to do four things: (A) discover and present evidence of brain damage and borderline intellectual functioning; (B) ensure that the sole mitigation witness, Ronald Tutein, was available to testify; (C) discover and present evidence of Sealey's background; and (D) present the results of Sherry Tubner's polygraph. Sealey also contends that (E) he was prejudiced by the cumulative effect of counsel's errors. We examine each contention in turn.

## A

We first address Sealey's argument that trial counsel failed to discover and present mitigating mental-health evidence. The state habeas court determined that

27

Sealey's lawyers' decision "not to pursue" mental-health evidence "was based upon a thorough and reasonable investigation" and "was not deficient." It further held that the lawyers "were not ineffective for not presenting [Sealey's] newly acquired mental health diagnoses" because there was "no reasonable probability that [Sealey's] trial would have had a different outcome given [its] unreliability." The court also concluded that at least some of Dr. Puente's test results were "unreliable" and found that his diagnoses were "the product of errant analysis."

**1**

Sealey contends that the state court's decision is both an unreasonable determination of the facts and an unreasonable application of Supreme Court precedent. On the facts, Sealey argues that the record doesn't support the state court's findings that Dr. Puente's results were "unreliable" or that his analysis was "errant" because multiple rounds of IQ testing all showed that Sealey was operating in the borderline range. Although the court took issue with the way that Dr. Puente administered the testing and his findings, Sealey argues that Dr. Puente is one of the test's developers, and that, as a neuropsychologist, he is more qualified than the state's expert, a forensic psychologist.

On the law, Sealey argues that, given the clear signs that he had mental-health issues, trial counsel's failure to further investigate and present evidence of these issues constituted deficient performance. According to Sealey, once Dr.

28

Farrar's preliminary investigation revealed that there was something "very, very wrong" with Sealey and that he likely "suffered from some kind of delusional, paranoid kind of disorder, perhaps even a psychoses, and that certainly a neurological kind of process, an organic brain problem needed to be evaluated"—an assessment that caused Beall to request funding for a full mental-health evaluation—counsel should have followed up.  In addition to Dr. Farrar's initial opinion, Sealey contends that counsel knew from different members of his family that he had a complicated birth and behavioral problems, and that "Sealey men" struggled with mental illness.  Sealey also points to Roberto's testimony during the state habeas proceedings that "Richard is not right," "not normal," and that he "[d]amn straight" had mental issues.  And even if (as the state habeas court decided) counsel chose not to investigate Sealey's mental health because they did not personally think that he suffered from mental illness, Sealey asserts that they weren't excused from procuring an evaluation, which they needed to make an informed decision.

**2**

On the record before us, we find counsel's failure to further investigate Sealey's mental health deeply troubling.  Beall and Roberto were put on notice by Dr. Farrar that something was "very, very wrong" with Sealey, that Sealey "suffered from some kind of delusional, paranoid kind of disorder, perhaps even a

29

psychoses," and "that certainly a neurological kind of process, an organic brain problem needed to be evaluated." Counsel also heard from Sealey's family that "Sealey men" suffered from mental-health issues, and Roberto himself acknowledged that Sealey was "not right" and "not normal." Dr. Farrar's comment, in particular, seemed to have made an impression on counsel, as it led Beall to request funds from the court for further evaluation. Even armed with all of this information though, counsel simply didn't follow through. We have recognized that "[i]n the context of penalty-phase mitigation in capital cases . . . it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence—such as mental illness . . . may be available." *Jones v. Sec'y, Fla. Dep't. of Corr.*, 834 F.3d 1299, 1312 (11th Cir. 2016). Having said that, we needn't decide here whether counsel's performance was constitutionally deficient because we hold Sealey was not prejudiced by any deficiency on their part.

In short, Sealey cannot prove that "absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Johnson*, 643 F.3d at 935 (alteration in original) (quotation omitted). Dr. Puente testified that Sealey suffered from "organic brain syndrome and borderline mental retardation or intellectual functions," and that Sealey had a "highly impaired paradigm" and "could be easily

30

swayed." Had these findings been presented in mitigation, the state surely would have presented Dr. King (or another expert) to rebut Dr. Puente's testing and conclusions. Dr. King testified during the state habeas proceedings that Dr. Puente did "not administer[] the [WAIS] test properly" and that, in any event, most of Dr. Puente's results were "consistent" with his own and "indicate[d] normal functioning." The state habeas court seemingly credited Dr. King's testimony over Dr. Puente's when it found that the results of at least some of Dr. Puente's tests were "unreliable" and stated that Dr. Puente's diagnoses were not "supported by the record and [were] the product of errant analysis." While Sealey claims that the state habeas court's determination of the facts in this regard was unreasonable, he hasn't come forward with clear and convincing evidence to rebut the presumption of correctness we must give to the state court's findings under § 2254(e)(1). *See Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1292 (11th Cir. 2012) ("Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." (quotation omitted)).

The state court's decision was reasonable, especially considering that Sealey's mental-health evidence—at least some of which was weakened by testimony from the state's expert—isn't nearly as compelling as mitigating evidence in cases where the Supreme Court has held that habeas relief was warranted. Take, for example, *Porter v. McCollum*, where the Court held that a

31

petitioner was prejudiced by his counsel's failure to present "(1) [his] heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling."  558 U.S. 30, 41 (2009).  When contrasted with a case like *Porter*, the new mental-health evidence presented here—of mild mental impairment—is insufficient to establish prejudice.

While the new mental-health evidence is debatable, the aggravating evidence presented against Sealey was powerful.  The jury found Sealey guilty of a brutal double murder, committed with an axe.  In recommending the death sentence, the jury found several aggravating circumstances to be present, including that the murders involved torture of the victims.  More specifically, Sealey tortured Mrs. Tubner with a hot fireplace poker before murdering her, with the intention of discovering where she and her husband hid their money.  During the sentencing phase, the state also presented evidence linking Sealey to another murder, testimony from a woman who alleged that Sealey had raped her while putting a gun to her temple, and several witnesses who described Sealey's misconduct and violence in prison.  What the Supreme Court said in *Strickland* applies here as well: "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the

32

aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700; *see also Jones*, 834 F.3d at 1315 ("In the face of these powerful aggravators and the arguably limited mitigating value of [the doctor's] testimony, [the petitioner] has not come close to showing that the [state court] acted unreasonably in finding no prejudice on account of counsel's deficient performance.").

The state habeas court's conclusion that Sealey did not suffer prejudice because of counsel's failure to present mental-health evidence therefore was not an unreasonable application of *Strickland*.

**B**

We next address Sealey's argument that his trial counsel were ineffective in failing to present Ronald Tutein—Sealey's nephew and the defense's sole mitigation witness—at sentencing. The state habeas court rejected this part of Sealey's claim on prejudice grounds, without deciding deficiency, holding that Tutein's testimony on habeas "was neither compelling nor mitigating for the crimes . . . [Sealey] had committed and [that] there is no reasonable probability that this testimony would have changed the outcome of [Sealey's] trial." We therefore give § 2254(d) deference to the state court's holding on prejudice, which—as we will explain—likewise leads us to reject Sealey's claim here.

33

## 1

Sealey argues that counsel's failure to present Tutein at sentencing was "quintessential deficient attorney performance" and that "[r]easonable capital defense counsel would have made certain that their witness arrived sufficiently in advance of the proceedings." As to prejudice, Sealey presented the following testimony of a juror from his trial: "I was surprised they didn't get just one relative, or a friend, or somebody, to get up and say, this person is somebody I care about, please don't kill him. I was waiting for somebody to say that and it would have made a difference to me." Although the state court dismissed Tutein's testimony as "neither compelling nor mitigating for [Sealey's] crimes," Sealey contends that he "need only show a reasonable probability that at least *one* juror may have been swayed to exercise mercy," not that the "unpresented evidence explains or lessens the brutality of the crime." Sealey asserts that Tutein would have appeared credible to the jury—because he is a deputy marshal for the Superior Court of the Virgin Islands—and that his testimony would have made a difference.

## 2

Even if counsel's performance was deficient—an issue that we needn't decide—Sealey cannot prove that he was prejudiced at sentencing by counsel's failure to present Tutein. While prejudice can be proven if "there is a reasonable probability that at least one juror would have struck a different balance," *see*

34

*Wiggins v. Smith*, 539 U.S. 510, 537 (2003), the state court reasonably concluded that no juror would have been swayed by Tutein's weak testimony. Although Sealey put forward the affidavit of a juror from his trial suggesting that testimony from his family would have made a difference, the assessment of prejudice does "not depend on the idiosyncrasies of the particular decisionmaker." *Strickland*, 466 U.S. at 695. Rather, the inquiry under *Strickland* is an objective one. *Id.*; *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) ("The [Supreme] Court made clear [in *Strickland*] that the assessment [of prejudice] should be based on an objective standard that presumes a reasonable decisionmaker.").

When assessing prejudice under *Strickland*, courts "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins*, 539 U.S. at 534, which appears to be exactly what the state habeas court did here. The state court acknowledged that most of Tutein's testimony was about Sealey's father, and the only testimony regarding Sealey was that "he was loud and always laughing and once discouraged [Tutein] from fighting" and that Sealey was a "good uncle" who was "always nice to [Tutein]." The court also considered Roberto's testimony that Tutein "was going to say a few kind words but there wasn't a lot of depth to" his testimony because Tutein hadn't spent a significant amount of time with Sealey. Against Tutein's relatively thin testimony, the state court weighed the "brutal torture and murder of Mr. and Mrs. Tubner," and had

35

before it the other aggravating evidence presented at sentencing—Sealey's implication in another murder, an allegation of rape, and Sealey's misconduct and violence in prison. *See supra* at 9–10, 32–33. Sealey cannot show that "no fairminded jurist" would have done as the state habeas court did in denying his claim. *See Raulerson*, 928 F.3d at 995–96 (quotation omitted); *see also Morrow*, 886 F.3d at 1152 (holding that the state court "reasonably concluded" that the petitioner's "new evidence would not have shifted 'the balance of aggravating and mitigating circumstances'" (quoting *Strickland*, 466 U.S. at 695)).

Accordingly, the state court's decision that Sealey suffered no prejudice as a result of his counsel's failure to present Tutein was not contrary to or an unreasonable application of clearly established federal law.

## C

Sealey next asserts that his counsel were ineffective in failing to discover and present other evidence pertaining to his background. The state habeas court detailed the steps that counsel took to investigate Sealey's childhood—including their trip to St. Croix—and concluded that counsel weren't ineffective. The court wasn't persuaded by the additional affidavits produced on habeas from persons who said that they would have testified on Sealey's behalf. It noted that some affidavit evidence was contradictory, and some was aggravating. The court further stated that "none of the affiants state [that Sealey] was abused or mistreated nor do

36

they state [that Sealey's] needs of food, clothing, shelter or even love were neglected."

The state court decided some parts of this challenge on *Strickland*'s deficiency prong and others on both the deficiency and prejudice prongs.[8] Under § 2254(d), we defer only to determinations actually made by the state court and otherwise conduct *de novo* review. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing the prejudice prong *de novo* because the state court didn't reach it). We conclude that we needn't parse the state court's sub-holdings because, even under *de novo* review, Sealey has not shown that he was prejudiced by his counsel's failure to discover or present this background evidence.

**1**

Sealey argues that, although the state habeas court recited the steps that defense counsel took in investigating his background, it failed to acknowledge his argument that counsel didn't follow through by presenting the evidence at sentencing or by obtaining additional witness testimony. He points out that no matter how thorough counsel's investigation was, there's no disputing that it netted

---

[8] For example, the state habeas court decided both that counsel weren't deficient in failing to present the lay witness testimony acquired during the state habeas proceedings and that this failure didn't prejudice Sealey. But as to counsel's gathering of background records, their investigation of mitigating evidence in St. Croix, and their decision not to interview Sealey's mother, the state habeas court made no determination on prejudice, deciding the claims on deficiency instead.

just a few documents and photos, which were simply entered as exhibits and went unexplained by defense counsel. Sealey asserts that counsel failed to gather and present evidence about his life that a jury could find mitigating, such as his difficult childbirth, his stutter, his "chaotic" move from the Virgin Islands to the Bronx, and his incarceration in difficult prison conditions. Additionally, Sealey contends that he has family, friends, and former teachers that would have testified on his behalf had they been located and asked. To show that such evidence and witnesses would have made a difference, Sealey again cites the testimony of jurors who said that they were waiting for the defense to provide insight into Sealey's life and background.

**2**

When considering prejudice, the "issue is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Johnson*, 643 F.3d at 935 (alteration in original) (quotation omitted). We conclude that the background evidence presented during the state habeas proceedings wouldn't have tilted the aggravating-mitigating balance away from the death penalty. On the contrary, and as the state habeas court acknowledged, much of the evidence produced was contradictory and possibly even aggravating.

What little mitigating evidence could be gleaned in the affidavits wouldn't have altered the outcome at Sealey's sentencing. It suggests, at most, that Sealey's childhood was "chaotic," that his parents were unstable and emotionally absent, that Sealey had a learning disability and stutter, that he was moved from St. Croix to New York as a pre-teen, and that he was incarcerated as a juvenile in an adult prison. This isn't nearly as extreme as the troubled childhoods of petitioners in other cases in which prejudice was found and relief was granted. In *Wiggins v. Smith*, for example, the Supreme Court recognized that the mitigating evidence that went unpresented was "powerful":

> [The petitioner] experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time [the petitioner] spent homeless, along with his diminished mental capacities, further augment his mitigation case.

539 U.S. at 534–35. The Supreme Court held that if this mitigating evidence had been presented at the petitioner's trial, "there [was] a reasonable probability that [the jury] would have returned with a different sentence." *Id.* at 536; *see also Williams*, 529 U.S. at 395–96 (describing the petitioner's childhood as "nightmarish" because he suffered severe and repeated beatings, was committed to the custody of social services, spent time in an abusive foster home, and failed to advance beyond sixth grade).

39

Some of the evidence regarding Sealey's background and childhood—even the evidence that could be considered mitigating—is contradictory and therefore of questionable reliability. For example, the affiants testified (1) that Sealey's parents were absent and that his father "ruled the[] house with fear," but also that his parents did not give him any boundaries and spoiled him; (2) that Sealey grew up in a "pretty rough" neighborhood, but also that it was full of "middle class families"; (3) that Sealey struggled in school and suffered from a stutter, but also that he was a good athlete, popular, and intimidating; and (4) that Sealey was a follower, but also that he was big for his age and stood up for other children.

Further—and worse for Sealey's prejudice argument—much of the evidence presented in the affidavits could be considered aggravating. For example, the affidavits state that, in St. Croix, Sealey often committed petty crime, especially theft and vandalism, that he sold drugs, and that his father paid off the police so that they would look the other way. An affidavit from Doris Walton—a friend of Pauline Corbitt, Sealey's half-sister—explains that Sealey blew through thousands of dollars given to him by his family (through Walton, as the family's contact in Atlanta) and, at one point, came into her office unannounced, placed a bag of marijuana on her desk (putting her job at risk), and laughed. Most seriously, several witnesses testified about Sealey's supposed participation in a robbery and shooting in the Virgin Islands.

In conclusion, there isn't a reasonable probability that Sealey's sentence would have been different if this background evidence was presented. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Even under *de novo* review, we conclude that Sealey was not prejudiced.

## D

Sealey next argues that counsel were ineffective in failing to present the results of Sherry Tubner's polygraph test during the sentencing phase. Part of defense counsel's "residual doubt" strategy was to suggest that Sherry Tubner—Mr. Tubner's daughter—was responsible for the murders. The results of a polygraph test indicated that Sherry had lied when asked whether she was involved with the Tubners' deaths. Defense counsel "tried 16 ways from Sunday" to get the polygraph admitted during the guilt phase, but it was deemed inadmissible by the state trial court. Counsel didn't attempt to admit it during the sentencing phase, which Sealey challenges as ineffective assistance.

The state habeas court rejected Sealey's argument for two reasons—one legal and one factual.[9] As a legal matter, the court held that counsel didn't perform

---

[9] The state habeas court also seemed to suggest that, in the alternative, this part of Sealey's claim was barred because the Georgia Supreme Court rejected it on direct appeal. But on Sealey's direct appeal, the Georgia Supreme Court reviewed only the exclusion of the polygraph results during the *guilt phase* because, as Sealey argues, "trial counsel did not seek, and therefore the trial court did not rule upon, their admissibility in the penalty phase." *See Sealey*, 593 S.E.2d at

41

deficiently in not attempting to admit the polygraph evidence at sentencing because, at the time of Sealey's trial, "polygraph results were inadmissible during the guilt/innocence phase and there was no precedent that allowed for their admission during the sentencing phase." The court cited *Baxter v. Kemp*—the prevailing law at the time of Sealey's trial—in which the Georgia Supreme Court concluded that counsel weren't ineffective for "failing to try to introduce inadmissible polygraph evidence at the sentencing phase." 391 S.E.2d 754, 756 n.4 (Ga. 1990), *overruled by Height v. State*, 604 S.E.2d 796, 798 (Ga. 2004). Although the Georgia Supreme Court held—after Sealey's trial—that polygraph results could be admitted at sentencing, *see Height*, 604 S.E.2d at 798, the state habeas court reasoned that Sealey's lawyers weren't required to predict developments in the law.

As a factual matter, the court also found that the polygraph was of questionable reliability because the report of Sealey's own expert, Walter Maddox, stated that Sherry might not have actually been lying. Thus, the court held that the evidence "would have, at the least been unreliable, and at the worst could have

---

339. Sealey's claim here, which pertains to admission of the polygraph during the *sentencing phase*, is thus properly before us.

further inculpated [Sealey] as the person wielding the axe and destroyed any reasonable doubt that may have existed from the guilt/innocence phase."[10]

## 1

Sealey challenges the state habeas court's legal reason for rejecting the claim, asserting that it was never the case that, under Georgia law, polygraph results were per se inadmissible during the *sentencing* phase. Sealey contends that counsel should have known that the rules of admissibility at sentencing are much more generous than during the guilt phase. Because defense counsel's sentencing strategy was "residual doubt," Sealey argues that the polygraph results were crucial to suggest Sherry's involvement. As to Maddox's report, Sealey maintains that it was privileged work product at the time of sentencing and that, accordingly, the state couldn't have used it against him.

## 2

The state habeas court's determination that Sealey's counsel weren't deficient was not an unreasonable application of *Strickland*. Legally, it seems to us that a plausible reading of *Baxter* at the time of Sealey's trial was that polygraph evidence was indeed inadmissible at sentencing. After all, *Baxter* held that the

---

[10] Because the state court clearly held that Sealey's counsel didn't perform deficiently, we give that holding deference under § 2254(d). The parties dispute whether the state court's determination that the polygraph would have been unreliable or possibly inculpatory if admitted constitutes a holding on prejudice. We needn't decide that here because, even under *de novo* review, Sealey's prejudice argument fails.

lawyers in that case didn't render ineffective assistance in "failing to try to introduce *inadmissible* polygraph evidence at the sentencing phase." 391 S.E.2d at 756 n.4 (emphasis added). Further, in *Height*—the case that overruled *Baxter*—the Georgia Supreme Court held that "to the extent that *Baxter v. Kemp* or any other case intimates that unstipulated polygraph results are per se inadmissible as mitigation evidence, it is hereby overruled." *Height*, 604 S.E.2d at 798 (citation omitted). That shows that before *Height* it was, at the very least, reasonable to interpret *Baxter* as precluding polygraph results during sentencing.

Even supposing that defense counsel should have surmised that the polygraph could be admitted at sentencing, that doesn't mean that they were deficient in failing to seek its admission. As a factual matter, knowing from the Maddox report that the polygraph's reliability was questionable, counsel could have strategically chosen not to present it for fear that it would be attacked and—as the state habeas court found—end up being more aggravating than mitigating. As counsel must have been aware, while there was no evidence tying Sherry Tubner to the crime scene, there was physical evidence implicating Sealey—including eyewitness testimony, the victim's gun and jewelry in Sealey's motel room, and the blood found in Sealey's motel bathroom.

Sealey's argument also fails because he cannot prove prejudice. Even if the state didn't have access to the Maddox report, it could have challenged the

44

reliability of the polygraph results in some other way or pointed to the physical evidence tying Sealey to the crime. Sealey has not shown that "there is a reasonable probability that . . . the result of the proceeding would have been different" had the polygraph results been admitted. *Strickland*, 466 U.S. at 694.

Thus, the state court's determination that counsel didn't perform deficiently wasn't an unreasonable application of *Strickland*. Moreover, Sealey cannot show, even on *de novo* review, that he was prejudiced.

**E**

The final aspect of Sealey's ineffective-assistance claim is that the state habeas court didn't "weigh the cumulative prejudice flowing from each of counsel's errors and omissions in the sentencing phase." Sealey contends that the evidence that counsel failed to discover and present at sentencing—expert testimony about his "brain impairment," witnesses to speak about Sealey's background, and the polygraph results—taken together, would have changed the vote of at least one juror.[11]

---

[11] It's unclear to us whether the state habeas court actually decided this claim. The court did hold that one of Sealey's claims—that "all claims combined resulted in an unfair trial and appeal, in violation of [Sealey's] constitutional rights"—failed to assert a state or federal constitutional violation and was non-cognizable because no cumulative-error rule existed in Georgia. Neither Sealey nor the state seem to address whether this part of the state court's holding affects our analysis. In any event, we take Sealey's argument before us to be different—that, while the state habeas court performed the aggravating-versus-mitigating balancing as to Sealey's individual ineffective-assistance claims, it didn't consider all the potentially mitigating evidence together.

In *Williams*, the Supreme Court held that the state habeas court's "prejudice determination was unreasonable [under *Strickland*] insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." 529 U.S. at 397–98. The mitigation evidence that the petitioner there presented, in total, "might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. In sum, the state habeas court in that case "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Id.*

We conclude that we needn't decide whether the state court unreasonably applied *Strickland* by failing to balance the aggravating evidence against all available mitigating evidence because Sealey's argument would still fail under *de novo* review. *See Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1290–91 (11th Cir. 2012) (explaining that "we are entitled to affirm the denial of habeas relief" by considering a petitioner's claim under a *de novo* lens); *see also McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (explaining that if "a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d)," we perform "a *de novo* review of the record"). We cannot say "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

46

The murders of Mr. and Mrs. Tubner were extremely brutal. Among other aggravating circumstances, the jury found beyond a reasonable doubt that both murders "involved the torture of the victims, depravity of mind, and the aggravated battery of the victims." *Sealey*, 593 S.E.2d at 336; *see* Ga. Code Ann. § 17-10-30(7). Sealey used a fireplace poker to torture Mrs. Tubner and bludgeoned both victims to death with an axe. The jury also had before it the rest of the state's aggravation case—allegations of another murder, an alleged rape, and misconduct and violence in prison. *See supra* at 9–10, 32–33. Compared to the aggravated nature of the case, the totality of mitigating evidence—both the sparse evidence that counsel presented during sentencing and the weak, contradictory, and potentially aggravating evidence produced on habeas—cannot lead us to conclude that "the balance of aggravating and mitigating circumstances did not warrant death." *Johnson*, 643 F.3d at 935 (quoting *Strickland*, 466 U.S. at 695) (analyzing the prejudice prong *de novo*).

\* \* \*

In sum, Sealey has not shown that his trial counsel were constitutionally ineffective under *Strickland* during the sentencing phase. We affirm the district court's denial of Sealey's petition as to his ineffective-assistance claim.

47

## V

We next consider Sealey's claims that the state habeas court and district court held to be procedurally defaulted because Sealey didn't raise them on direct appeal: (1) that the trial court's denial of a continuance at sentencing denied him due process and a fair trial; (2) that the death sentence was unconstitutionally arbitrary and in violation of Georgia's sentencing scheme; and (3) that he was denied his right to represent himself under *Faretta v. California*, 422 U.S. 806 (1975).[12]  Sealey argues that he can overcome the procedural default of these claims by showing his appellate counsel were ineffective in failing to raise them on direct appeal.  Before considering Sealey's ineffective-assistance-of-appellate counsel arguments, we'll briefly summarize the exhaustion requirement and the steps of our procedural-default analysis.

## A

For a federal court to review a claim for habeas relief, a petitioner must "first properly raise the federal constitutional claim in the state courts"—*i.e.*, exhaust it.  *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (citing 28 U.S.C. § 2254(b)).  As relevant to Sealey's case, Georgia's appeal process requires that a petitioner seek a certificate of probable cause to appeal to the Georgia Supreme

---

[12] "We review *de novo* the determination of a district court that a habeas petitioner is procedurally barred from raising a claim in federal court."  *Henry v. Warden, Ga. Diagnostic Prison*, 750 F.3d 1226, 1230 (11th Cir. 2014).

48

Court; claims not raised in an application for a certificate of probable cause are considered unexhausted on subsequent federal habeas review. *Hittson v. GDCP Warden*, 759 F.3d 1210, 1231 & n.22 (11th Cir. 2014); *see also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (per curiam).

Relatedly, federal courts are barred from reviewing a habeas petitioner's claim "if a state court rejected it on a state procedural ground." *Henry v. Warden, Ga. Diagnostic Prison*, 750 F.3d 1226, 1230 (11th Cir. 2014). Such a state-court ruling precludes federal review of the underlying claim so long as it "rests upon [an] 'independent and adequate' state ground."[13] *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). We can consider a defaulted claim, however, if a petitioner can show (1) "cause for the default" and (2) "actual prejudice resulting from the alleged constitutional violation." *Ward*, 592 F.3d at 1157 (citing *Wainwright*, 433 U.S. at 84–85).[14] A petitioner can establish "cause" by "identify[ing] 'some objective factor external to the defense' that impeded his ability to raise the claim

---

[13] We review *de novo* whether a claim has been procedurally defaulted, as it "is a mixed question of fact and law." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017) (quotation omitted). Sealey doesn't seem to dispute that the state habeas court's ruling—that his claims were procedurally defaulted—"rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (quotation omitted); *see also id.* at 1176 (holding that "the state habeas court's procedural default ruling [applying Georgia's procedural default rule barring habeas review of claims not raised at trial or on direct appeal] rested on an adequate state law ground"). We therefore proceed to consider Sealey's argument that he has overcome the default.

[14] A petitioner can also overcome a procedural default by showing "a fundamental miscarriage of justice," *Holladay v. Haley*, 209 F.3d 1243, 1254 (11th Cir. 2000), but that exception isn't at issue here.

49

in state court." *Henry*, 750 F.3d at 1230 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To establish "actual prejudice," "a petitioner must demonstrate that the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *Ward*, 592 F.3d at 1157 (quotation omitted).

A showing of ineffective assistance of appellate counsel in failing to raise a claim on direct appeal can constitute "cause" so long as the ineffective assistance "occur[red] during a stage when a petitioner had a constitutional right to counsel," *Payne v. Allen*, 539 F.3d 1297, 1314 (11th Cir. 2008), and the ineffective-assistance claim itself is "both exhausted and not procedurally defaulted," *Ward*, 592 F.3d at 1157 (citing *Hill v. Jones*, 81 F.3d 1015, 1031 (11th Cir. 1996)). No one disputes that Sealey had a right to counsel during his state-court trial and direct appeal. *See Payne*, 539 F.3d at 1314. We also conclude that Sealey properly exhausted[15] his ineffective-assistance-of-appellate-counsel claim because the state

---

[15] The state contests whether Sealey exhausted his ineffective-assistance-of-appellate-counsel claim. To properly exhaust an ineffective-assistance-of-appellate-counsel claim, Sealey must have "assert[ed] this theory of relief and transparently present[ed] the state courts with the specific acts or omissions of his lawyers that resulted in prejudice." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004). Even though Sealey didn't develop his ineffective-assistance-of-appellate-counsel claim as well as he could have, we conclude that the claim is exhausted because the state habeas court "had an opportunity to address [Sealey's] claim[] in the first instance when it rejected the merits of his [ineffective-assistance-of-appellate-counsel] claim." *Holland v. Florida*, 775 F.3d 1294, 1316 (11th Cir. 2014) (quotation omitted); *see also Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984) ("There is no better evidence of exhaustion than a state court's actual consideration of the relevant constitutional issue.").

50

court actually considered and denied it.[16]

**B**

"[T]o determine cause and prejudice, we must ascertain whether [Sealey] has shown ineffective appellate counsel in not timely raising" the procedurally defaulted claims, and "to determine whether [Sealey] has shown ineffective appellate counsel, we must determine whether [he] has shown underlying meritorious . . . claims." *Id.*; *see also Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) (holding that "because there is so little merit to the [defaulted] claim, [the petitioner] cannot demonstrate that his appellate attorneys were ineffective by failing to raise it on direct appeal"). As with any ineffective-assistance claim, the Supreme Court's decision in *Strickland* governs. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (stating that *Strickland* applies to ineffective-assistance-of-appellate-counsel claims); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (stating that, while "counsel's ineffectiveness in failing properly to

---

[16] The state habeas court held that Sealey "failed to present any evidence" to support his ineffective-assistance-of-appellate-counsel claim and that Beall spent a "considerable amount of time, 207 hours, preparing" for Sealey's motion for a new trial and direct appeal. Whether the state court's decision concerning the ineffective-assistance-of-appellate-counsel claim receives deference under § 2254(d) within this procedural default analysis is an issue that has divided courts. *Compare Visciotti v. Martel*, 862 F.3d 749, 768–69 (9th Cir. 2016) (noting the disagreement among circuits and deciding to review the ineffective-assistance claim within the procedural default context *de novo*), *with Richardson v. Lemke*, 745 F.3d 258, 273 (7th Cir. 2014) ("In our circuit, when we review a state court's resolution of an ineffective assistance claim in the cause-and-prejudice context, we apply the same deferential standard as we would when reviewing the claim on its own merits."). We needn't address the conflict here because even under *de novo* review, Sealey's ineffective-assistance-of-appellate-counsel claim fails.

51

preserve the claim for review in state court will suffice" as cause, "the assistance must have been so ineffective as to violate the Federal Constitution"). We have acknowledged that "[a]n attorney is not required under the Constitution or the *Strickland* standards to raise every non-frivolous issue on appeal," and that "there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim." *Brown*, 720 F.3d at 1335.

To assess ineffectiveness, therefore, we proceed to the underlying merits of Sealey's procedurally defaulted claims. We conclude that these claims are without merit and thus, Sealey's counsel weren't ineffective in failing to raise them on direct appeal and he suffered no actual prejudice as a result. He therefore cannot overcome the default.

**1**

Sealey argues that the trial court's denial of a one-day continuance denied him due process and a fair trial. Sealey contends that "[n]o reasonable attorney would fail to challenge" the denial of the continuance—which he calls "perhaps the most consequential erroneous ruling by the trial court"—on direct appeal.

On the continuance claim's underlying merits, Sealey argues that, although trial courts have discretion to grant or deny continuances, the trial court's denial of a modest, one-day continuance deprived him of due process, a fair trial, and the effective assistance of trial counsel. Sealey relies primarily on two cases: *Morris v.*

*Slappy*, 461 U.S. 1, 11–12 (1983) (quotation omitted), for the proposition that "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel"; and *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003), for the proposition that in order to succeed on this type of claim, a habeas petitioner must show that the trial court's error in denying him a continuance deprived him of a fundamentally fair trial in violation of due process, which resulted in actual prejudice. In *Morris*, the Supreme Court rejected a habeas petitioner's claim that the trial court abused its discretion and violated the petitioner's right to counsel by denying a continuance that he had requested because his appointed counsel was substituted only six days before trial. 461 U.S. at 3–4. The Supreme Court held that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Id.* at 11–12 (quotation omitted). And again, the Court ultimately found no Sixth Amendment violation. *Id.* at 3.

We conclude that Sealey cannot prove that his appellate counsel were ineffective in failing to raise the continuance claim because it lacked merit. The state trial court's decision to deny the continuance in Sealey's case cannot be considered "unreasoning" or "arbitrary" under *Morris* because the court acted

53

within its discretion to deny the continuance. *See Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1326 (11th Cir. 2002) ("The decision of whether to grant a continuance is reserved to the sound discretion of the trial court."). The court engaged in a colloquy with Sealey's lawyers in an effort to understand why Tutein wasn't available and stressed that they should have been prepared for their witness to testify.

Moreover, Sealey acknowledges that he "must also show that the denial [of the continuance] resulted in actual prejudice." Br. of Petitioner at 104–05 (citing *Powell*, 332 F.3d at 396); *see also Van Poyck*, 290 F.3d at 1326 ("[T]o establish that a denial of a continuance was reversible error, a defendant must show that the denial caused specific substantial prejudice." (quotation omitted)). Had the trial court granted his request for a continuance to allow for Tutein's arrival, Sealey cannot show that Tutein's testimony would have changed the outcome at sentencing, given the weak nature of the testimony compared to the heinous nature of the crimes and other aggravating circumstances. *See supra* at 34–36.

Because Sealey wouldn't have succeeded on his continuance claim had it been raised on direct appeal, he cannot prove that his counsel were ineffective in failing to raise it or that he suffered actual prejudice as a result. *See Brown*, 720 F.3d at 1335. Especially considering that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, Sealey's

54

counsel could have strategically decided not to raise this claim in order to focus on others during his direct appeal. Accordingly, Sealey cannot overcome the procedural default of this claim.

**2**

As for his next defaulted claim, Sealey argues that the death sentence was arbitrary and constitutionally insufficient for essentially two reasons: (a) the aggravating circumstances for the two murders were consolidated, in violation of Georgia's sentencing procedures and *Gregg v. Georgia*, 428 U.S. 153 (1976); and (b) the state trial court found an aggravating circumstance necessary to impose the death penalty, in violation of the Sixth Amendment and *Ring v. Arizona*, 536 U.S. 584 (2002).

The state habeas court determined that Sealey's claim was procedurally defaulted because he didn't raise it in his direct appeal and, alternatively, that it was without merit. The court reasoned that Georgia's capital-sentencing scheme doesn't require the jury to designate for which murder it is imposing the death sentence and, in any event, that at least one aggravating circumstance was found for each murder. Because the state court decided in the alternative to reject the claim on the merits, we give that decision deference under § 2254(d). *See Raulerson*, 928 F.3d at 1001 (holding that "a state court's alternative holding is an

55

adjudication on the merits" that is reviewed "under the deferential framework set forth in section 2254(d)(1)").

As we will explain, because this claim is without merit, Sealey's counsel's failure to raise it cannot constitute ineffective assistance.

**a**

First, according to Sealey, "the jury failed to determine the aggravating factors for each count" and instead "improperly consolidated both determinations and submitted to the trial judge one aggravating factor determination and one sentence, as opposed to two separate determinations and two sentences, one for each count." This, Sealey contends, violates the Supreme Court's decision in *Gregg* because it doesn't adhere to the capital-sentencing procedures that the Supreme Court approved in that case—that Georgia juries must "identify at least one statutory aggravating factor" for each crime before imposing the death penalty. 428 U.S. at 206.

This also shows, Sealey argues, that the verdict is arbitrary because "it did not adhere to the unanimity requirement under Georgia's sentencing laws." Because the jury returned a single death sentence without specifying as to which murder it applied, it is possible, Sealey theorizes, that some jurors intended to vote for a death sentence in conjunction with the murder of Mrs. Tubner and others in conjunction with the murder of Mr. Tubner, with no unanimity for either offense.

The state trial court then "compounded the jury's error," Sealey argues, by imposing a single death sentence based on "Counts I and II of the indictment"—*i.e.*, the murder charges.

Contrary to Sealey's assertion, the jury's findings as to aggravating circumstances distinguished between the two murders. Sealey acknowledges that "the trial court charged the jury to deliberate on two sentences for two murder crimes." While the sentencing verdict form only asked the jury to mark whether or not aggravating circumstances existed, and further, which penalty it chose, *another* form given to the jury—titled "Findings of Jury as to Alleged Statutory Aggravating Circumstances"—clearly asked the jury to mark whether it found each aggravating circumstance, as to each murder, beyond a reasonable doubt. After the jury rendered its verdict, the judge read aloud the jury's findings on the statutory aggravating circumstances, specifying to which murder each applied.[17] The jury therefore clearly weighed the aggravating circumstances for each murder separately.

Sealey's death sentence also complied with Georgia's sentencing scheme. The state habeas court acknowledged that, in Georgia, the finding of a single statutory aggravating circumstance renders a defendant eligible for the death penalty; whether to impose death lies with the jury. Ga. Code Ann. § 17-10-30(c).

---

[17] The court also polled the jurors and confirmed that each chose to impose the death penalty.

57

The jury found ten statutory aggravating factors—five pertained to Sealey's murder of Mr. Tubner and five pertained to his murder of Mrs. Tubner. Because the jury found more than one aggravating factor for each murder, Sealey's death sentence doesn't contravene § 17-10-30 or *Gregg*.

**b**

Second, Sealey asserts that the trial court's decision—"that, when all the relevant aggravating and mitigating factors are taken together, a death sentence is the appropriate response to the murder of John Tubner *or* Fannie Tubner"—was an unconstitutional factual finding under the Sixth Amendment, which prohibits a sentencing judge (sitting without a jury) to find an aggravating circumstance necessary to impose the death penalty. *See Ring*, 536 U.S. at 609.

In *Ring*, the Supreme Court invalidated Arizona's sentencing scheme, which allowed a "trial judge, sitting alone, [to] determine[] the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." *Id.* at 588. The Court made clear in *Ring* that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. Here, Sealey's sentence doesn't run afoul of the Sixth Amendment or *Ring*. It was the jury—not the state trial judge—that found the aggravating circumstances necessary to impose the death penalty. The jurors were given a form on which aggravating circumstances

58

were found beyond a reasonable doubt, as to each murder.  The judge read this form aloud and imposed a death sentence based on the jury's findings, but it was the jurors who determined that the aggravating circumstances existed.

Because Sealey's verdict-based claim would not have succeeded had it been presented, Sealey cannot show that appellate counsel were ineffective in failing to raise it or that he suffered actual prejudice as a result.  He therefore cannot overcome the procedural default.

**3**

In his final procedurally defaulted claim, Sealey argues that he was denied the right to represent himself at trial under *Faretta v. California*, 422 U.S. 806 (1975).  Sealey contends that the trial court's repeated admonitions and reluctance to allow him to proceed without counsel, combined with the court's "refusal to appoint stand-by counsel other than Beall and Roberto," caused an "involuntary" waiver of his right to self-representation.

In *Faretta*, the Supreme Court recognized a "right of self-representation" grounded in the Sixth Amendment right to counsel.  *Id.* at 818.  When a defendant "insists that he wants to conduct his own defense," a state may not "constitutionally hale a person into its criminal courts and there force a lawyer upon him." *Id.* at 807.  Because a defendant choosing to represent himself "relinquishes, as a purely factual matter, many of the traditional benefits associated

59

with the right to counsel," a defendant "must knowingly and intelligently" choose that course. *Id.* at 835 (quotation omitted). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

Sealey's *Faretta* claim lacks merit and, accordingly, appellate counsel weren't ineffective in failing to raise it on direct appeal. True, Sealey asserted his right to self-representation when he stated "I want to represent myself," and clarified, "with standby counsel." But Sealey later changed his mind: Following the district court's explanation of the risks of self-representation, and after conferencing with Beall and Roberto, Sealey unambiguously said that "[w]ithout waiving my rights to a conflict, I'd like to proceed with these two attorneys [*i.e.*, Beall and Roberto] as counsel," and he later clarified that he wanted them to represent him "as trial counsel," not standby counsel. The state trial court's warnings were proper, considering that *Faretta* requires that a defendant be "made aware of the dangers and disadvantages of self-representation." And while the trial judge warned Sealey that he would be at a "severe disadvantage" proceeding without a lawyer and "strongly advise[d]" him not to represent himself, he also

60

acknowledged that "I cannot force lawyers upon you" and "[t]he law says you have the right to represent yourself."[18]

Sealey cannot prove that his appellate counsel were ineffective in failing to raise this claim on direct appeal or that he was actually prejudiced and thus, Sealey cannot overcome the procedural default of this claim.

\* \* \*

In sum, because his procedurally defaulted claims are not meritorious, Sealey cannot prove that his appellate counsel rendered constitutionally ineffective assistance in failing to raise them on direct appeal or that he suffered actual prejudice. He thus cannot overcome the default. Accordingly, we affirm the district court's denial of Sealey's petition as to his procedurally defaulted claims.

## VI

We conclude that the district court did not err in denying Sealey's petition for a writ of habeas corpus. The state habeas court's denial of Sealey's ineffective-assistance-of-trial-counsel claim was not contrary to or an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. As to

---

[18] The trial judge went on to say: "I guess it's sort of like I have the right to operate on my own foot if I want to. You can do it. It might not be the smartest thing you've ever done in your life . . . but you have the right to do that. I don't think you should, but it's your decision." Although the judge might have been forceful in suggesting that Sealey shouldn't represent himself, he plainly gave Sealey a choice. The judge's warnings do not rise to the level of rendering Sealey's waiver "involuntary."

Sealey's procedurally defaulted claims, we conclude that he cannot show cause

and prejudice to justify his failure to raise the claims on direct appeal.  We

therefore affirm the district court.

**AFFIRMED.**