[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11090

_____

D.C. Docket No. 4:17-cv-00211-MHC

MICHAEL WILLIAM LEDFORD,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 15, 2020)

Before WILLIAM PRYOR, Chief Judge, NEWSOM, and BRANCH, Circuit
Judges.

NEWSOM, Circuit Judge:

Michael Ledford was convicted by a Georgia jury of malice murder, felony murder, aggravated battery, aggravated sodomy, kidnapping with bodily injury, and aggravated assault. *Ledford v. State*, 709 S.E. 2d 239, 245 n* (Ga. 2011). On appeal from the district court's denial of federal habeas corpus relief, Ledford does not contest his conviction—only the sentence of death imposed by the same jury. In challenging his death sentence, Ledford argues (1) that prosecutors exercised their peremptory challenges in a way that discriminated against women, (2) that his trial counsel rendered constitutionally ineffective assistance during the penalty phase of his trial, and (3) that one of the jurors in his trial lied during voir dire and thus deprived him of an impartial jury.

Having carefully reviewed the parties' briefs and heard oral argument, we hold that none of Ledford's arguments entitle him to relief.

## I

### A

The horrific facts of Ledford's crime are not presently disputed. The Georgia Supreme Court described them as follows:

> The evidence presented at trial showed that, on July 25, 2006, Michael Ledford pretended to go to work but, instead, bought beer and drank it near the Silver Comet Trail, a recreational trail used for biking, running, and other activities. Ledford knocked Jennifer Ewing from her bicycle as she rode by his location. He dragged her a distance off the trail to a location shielded from view by vegetation. He stripped off all of her clothing from the waist down, and he pulled her shirt up part way, exposing her breasts. She suffered bruises throughout her

2

body in the struggle.  When Ledford forced his penis into her mouth, she bit his penis and severely wounded it.  Enraged by her resistance, Ledford unleashed a shocking attack during which he stomped on her face and nose, her larynx, and her ribs.  Ms. Ewing gradually succumbed to asphyxiation caused by her wounds and the resulting bleeding into her lungs.

*Ledford*, 709 S.E.2d 239 at 245.

## B

### 1

The procedural history of Ledford's case is both exceedingly complicated and largely unnecessary to his appeal.  We will focus on a few key points.

### a

The first is jury selection.  During voir dire, juror Harold Ridarick testified that, as a general matter, he was not conscientiously opposed to a sentence of life with the possibility of parole as a penalty for murder.  When asked if he would automatically vote for any one of the three possible penalties—life, life without parole, and death—he said that he would "equally consider" them.  When the prosecutor asked, however, whether Ridarick "fit[s] into the category" of people who would not "consider life with the possibility of parole for somebody that's committed a malice or felony murder," Ridarick answered: "I would probably fit into that category."  After the prosecutor asked him to clarify whether he was saying that "once [he] made that decision that they committed that malice or felony murder that life with the possibility of parole is really not an option," Ridarick

3

clarified: "I'd still have to weigh the mitigating circumstances, factors, and you know, depending on those I think I could go with either of the three."

"Out of an abundance of caution," Ledford's trial counsel moved, unsuccessfully, to have Ridarick removed for cause based on his apparent reticence to "consider life with the possibility of parole for one that he found guilty of malice or felony murder." As we will explain later, Ledford now argues that Ridarick lied during voir dire and that, in fact, he was really only ever willing to consider the death penalty. Ledford's new objection is based on several of Ridarick's online postings from May 22 and 23, 2009—the day and the day after the jury sentenced Ledford to death—which Ledford's lawyers apparently discovered sometime in late 2013 or early 2014.

**b**

Also during voir dire, the state used nine of its twelve peremptory strikes to remove females, who made up 15 of the 36 (or 42% of) venire members. Ledford challenged these strikes as discriminatory, but the trial court determined that he had not made a prima facie showing of discrimination, and so denied the challenge without requiring the state to proffer non-discriminatory reasons for the strikes.

**c**

After jury selection came the trial, which was bifurcated into guilt and penalty phases. At the close of the guilt phase, the jury convicted Ledford of

4

malice murder for killing Ewing and of all other related charges.  A few days later

at the close of the penalty phase, the same jury imposed a death sentence.  Ledford

challenges his defense team's penalty-phase strategy, which he says amounted to

constitutionally ineffective assistance of counsel.  In particular, Ledford asserts

that his lawyers erred in putting on evidence concerning antisocial personality

disorder (ASPD) and psychopathy, which, he says, permitted prosecutors to argue

those issues against him.  With respect to Ledford's ineffective-assistance claim,

some background is in order.

Defense counsel decided that the "primary sentencing phase strategy [would

be] to show the jury that [Ledford] had voluntary and involuntary brain damage,

which diminished his frontal lobe capacity and prevented him from controlling his

impulses."  To that end, they wanted to use experts to establish that Ledford had

"psychiatric issues, based a lot on his upbringing and also his drug use and alcohol

abuse," as well as eyewitness testimony to establish brain injury.  Counsel planned

to augment their brain-damage strategy with testimony from Ledford's family

members designed to humanize him.

During opening statements at the penalty phase, defense counsel laid out

their main theory to the jury.  They described Ledford's upbringing as abusive and

dysfunctional and said that he suffered brain damage when he was a child.

Counsel emphasized that Ledford didn't choose to be brain-damaged; that he

5

didn't choose to have an abusive upbringing; and that he didn't necessarily even choose to be an alcoholic—a condition that allegedly exacerbated the brain damage. Counsel didn't mention anything about Ledford having ASPD or psychopathy during opening arguments.

Defense counsel put on copious evidence in aid of their brain-damage theory. Especially important was the testimony of Ledford's brother Donald. He testified that when Ledford was about eight or nine he fell out of a tree, landed on a garage, rolled off, and hit the ground. Donald had initially thought the fall had killed Ledford, who wasn't moving. Ledford remained hospitalized for a month and had to wear an upper-body cast for another month. Donald explained that Ledford's behavior changed after this injury and that he began experiencing severe migraines.

Defense counsel also put on abundant expert testimony: from a mitigation investigator, a forensic psychiatrist, a psychopharmocologist, a clinical social worker, a neuropsychiatrist, an internist, and two more psychologists—all in aid of their overarching theory that childhood injury and substance abuse had damaged Ledford's brain and rendered him mentally unwell and that this confluence of events was not his fault. It was during expert testimony—especially on cross-examination—that ASPD and psychopathy first came up. To provide some salient examples, defense expert Dr. Thomas Sachy testified that people with brain scans

that show a pattern of damage like Ledford's have impaired moral judgment. He explained that "if you put these people in a high dilemma situation with this brain damage, they were more likely to do things that they would later think were amoral." On cross, Dr. Sachy allowed that the damage to Ledford's brain would leave him "prone to rage."

Defense expert Dr. Robert Shaffer similarly testified that someone with Ledford's pattern of brain damage "would not really have feelings about the consequences of what they were doing, the impact that it would have on someone else, the ability to empathize with another person and feel a concern about what would happen to that other person." He also likened Ledford to "sexual sadists." Defense counsel asked Dr. Shaffer background questions about psychopathy generally, and specifically elicited testimony that psychopathy is not a choice. On cross, Dr. Shaffer observed that a rape of which Ledford had previously been convicted was consistent with "sexual sadism." He further testified that a previous breaking-and-entering conviction was "consistent with what we're seeing, which is an individual who has no sense of emotion regarding the impact of his actions on someone else." He also noted that Ledford's pattern of lying to cover his crimes was "very characteristic of what we call psychopathic behavior."

On rebuttal, the state called its own experts, who supported the conclusion that Ledford was either antisocial, a psychopath, or both, but who disputed the notion that his disorder was caused by brain damage.

Defense counsel's strategy failed; at the conclusion of the penalty phase, the jury sentenced Ledford to death.

**2**

Ledford moved unsuccessfully for a new trial and then appealed his conviction to the Georgia Supreme Court, which affirmed both his conviction and the death sentence. In so doing, that court considered and affirmed the trial judge's determination that Ledford failed to make a prima facie case that the prosecution discriminated on the basis of gender in exercising its peremptory strikes. Ledford didn't raise his juror misconduct or ineffective-assistance-of-trial-counsel claims before the Georgia Supreme Court—or at any time on direct appeal. *See generally Ledford*, 709 S.E.2d 239. Ledford filed a petition for certiorari in the United States Supreme Court, which was denied, ending his direct appeal.

**3**

Ledford then sought state habeas relief. Most importantly for our purposes, Ledford argued—for the first time—that Ridarick had lied in response to questions at voir dire. Ledford sought to subpoena Ridarick and other jurors to testify that Ridarick was unwilling to consider penalties other than death. In support of the

8

subpoenas, Ledford proffered screenshots of Ridarick's May 2009 online postings, in which Ridarick had stated that "the only just punishment was the death penalty."[1]  The posts clearly showed that Ridarick had expressed the belief that only the death penalty was appropriate for Ledford, but they did not make clear when he came to that conclusion.  For instance, one stated: "So I pointed out to the jury that by giving life in prison to Ledford we were giving him exactly what he wanted."  He continued: "I myself could not sleep soundly at night knowing that I had given a man convicted of malice murder the exact sentence he wanted and that the only just punishment was the death penalty."  The state successfully moved to quash Ledford's subpoenas, contending that the juror testimony would be inadmissible under Georgia law.[2]

The state habeas court never decided on the merits whether Ledford was entitled to relief based on Ridarick's posts.  The state argued that Ledford had forfeited any argument about Ridarick's supposed bias by virtue of his failure to raise it on direct appeal, and the state incorporated its procedural-default position into a proposed order denying Ledford's state habeas petition.  The state habeas

---

[1] Other than the online postings themselves, Ledford offers no evidence to show that any of the subpoenaed jurors would have, in fact, given testimony to contradict Ridarick's sworn statements at voir dire.

[2] Because we ultimately hold Ledford's juror-misconduct claims to be procedurally barred, we need not and do not decide whether the testimony of the subpoenaed jurors would be admissible under either Georgia or federal law.

court adopted the state's proposed order, holding that Ledford had procedurally defaulted his juror-misconduct claim by failing to raise it on direct appeal. In the same order, the state habeas court considered and rejected on the merits Ledford's claim that his trial counsel were ineffective for offering evidence pertaining to ASPD and psychopathy.[3] The court held both that counsel's performance was not deficient and that Ledford suffered no resulting prejudice.

The Georgia Supreme Court declined to review the state habeas court's decision, summarily denying Ledford's application for a certificate of probable cause. Ledford again unsuccessfully sought certiorari from the United States Supreme Court.

### 3

Ledford next initiated federal habeas corpus proceedings in the Northern District of Georgia. He brought all three claims at issue here—that the prosecutor had exercised his peremptory strikes in discriminatory fashion, that his trial counsel had provided ineffective assistance during the penalty phase, and that Ridarick had lied to conceal bias during voir dire. Ledford also sought an

---

[3] Ledford did not raise his juror-selection claim in state habeas proceedings, although he had raised it on direct appeal. The state notes this omission in its brief, but it does not argue that this claim is unexhausted. We conclude that the claim was properly exhausted because in Georgia "an issue actually litigated and decided on direct appeal is precluded from being relitigated on [state] habeas corpus," at least "[a]bsent compelling reasons, such as a miscarriage of justice." *Turpin v. Todd*, 493 S.E.2d 900, 909 (1997); *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) ("[I]n order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review.").

evidentiary hearing to develop additional evidence pertaining to his juror-misconduct claim.  The district court denied both Ledford's request for a hearing and his petition.  After the district court also denied his motion to alter or amend the judgment, Ledford appealed to this Court.

## II

The state courts rejected two of Ledford's claims—that the prosecution exercised peremptory strikes in a discriminatory manner to exclude women and that his trial counsel rendered constitutionally ineffective assistance of counsel—on the merits, and one of his claims—that Ridarick lied during voir dire—on procedural grounds.  These two different postures lead to two different standards of review in this Court.

The Antiterrorism and Effective Death Penalty Act (AEDPA) forbids us to grant relief on a "claim that was adjudicated on the merits in State court proceedings unless" the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).

> A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  A state court decision involves an unreasonable application of federal law "if the state court identifies

11

the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1330–31 (11th Cir. 2019) (alterations in original) (citations omitted). Importantly, as used in § 2254(d), "unreasonable" means "more than simply incorrect." *Sealey v. Warden, Georgia Diagnostic Prison*, 954 F.3d 1338, 1354 (11th Cir. 2020). An "application of federal law is unreasonable only if no fairminded jurist could agree with the state court's determination or conclusion." *Id.* (quoting *Raulerson v. Warden*, 928 F.3d 987, 995–96 (11th Cir. 2019)). "This is a 'difficult to meet and highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt.'" *Id.* (quoting *Raulerson*, 928 F.3d at 996).

Because the Georgia courts considered and rejected Ledford's jury-selection and ineffective-assistance-of-counsel claims on the merits, AEDPA's deference regime applies to both. The Georgia courts did not consider Ledford's juror-misconduct claim on the merits but rather rejected it on procedural grounds. Accordingly, instead of AEDPA's deference regime, we will apply "cause-and-prejudice" analysis to determine whether Ledford can overcome his procedural default. We will explain the standards that govern that analysis below, in conjunction with our evaluation of that claim.

## A

Ledford first challenges his conviction on the ground that the prosecution discriminated against women in selecting his jury in violation of the Fourteenth Amendment. Ordinarily, "[p]arties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review," but they may not exercise such strikes "solely because of race or"—as relevant here—"gender." *J.E.B. v. Alabama*, 511 U.S. 127, 143, 146 (1994). "[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man." *Id*. at 146.

A well-established burden-shifting framework governs claims that the prosecution exercised peremptory strikes in a discriminatory manner. As the Supreme Court has explained it:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the . . . exclusion by offering permissible [gender]-neutral justifications for the strikes. Third, if a [gender]-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (quotations and quotation marks omitted); *see also Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330,

13

1343–44 (11th Cir. 2019) (applying the same burden shifting framework to a gender-discrimination claim), *cert. denied sub nom. Smith v. Dunn*, No. 19-7745, 2020 WL 3578738 (U.S. July 2, 2020).

Both the state courts and the district court rejected Ledford's jury-selection claim at the first step—they determined that he failed to make a prima facie case of gender discrimination. *Ledford*, 709 S.E.2d at 253. We agree, and we thus cannot conclude that "no fairminded jurist could agree with the state court's determination or conclusion." *Sealey*, 954 F.3d at 1354 (quotation omitted).

Ledford relied solely on statistical disparities in seeking to make out a prima facie case of discrimination; he did not present any additional facts. *Ledford*, 709 S.E.2d at 253. The state, he says, used 9 of its 12 peremptory strikes against female jurors, where females made up 15 of the 36 prospective jurors. Ledford further points out that while women made up 42% of the venire, the prosecution used 75% of its peremptory strikes against women. This resulted in a jury, he complains, with only two female jurors (17%).[4]

But not just any statistical disparities will suffice to demonstrate a prima facie case of discrimination. *See United States v. Hill*, 643 F.3d 807, 838 (11th Cir. 2011) ("Under our precedent *these* statistics, without more, do not establish a prima facie case." (emphasis added)). And our precedent makes clear that

---

[4] Two out of four alternates were also women, bringing the total to four out of sixteen (25%).

14

statistical disparities of the magnitude present in Ledford's jury do not support a prima facie case. In *Hill*, for example, "[t]he government had, and it exercised, 14 peremptory strikes; it used 9 (64%) of them against black venire members," who represented 41% of the venire. *Id*. Nevertheless, we affirmed the district court's determination that the defendant had not made out a prima facie case of discrimination. *Id*. at 840.

In *Hill*, we also drew on our earlier decision in *United States v. Campa*, where "the government was allotted 11 peremptory strikes and used 9 of them," and "[s]even of those nine strikes (78%) were used against blacks." *Id*. at 838 (citing *Campa*, 529 F.3d 980, 989 (11th Cir. 2008)). If measured as a percentage of strikes actually used, rather than as a percentage of those allotted, the disparity in *Campa* was even starker than that here—78% as against 75%. And even if measured as a percentage of allotted challenges, this case involves an only slightly greater disparity—64% vs. 75%. Yet in *Campa*, despite numbers arguably more suggestive of discrimination than we face here, we *reversed* the district court's determination that the defendant had made out a prima facie case. *See Campa*, 529 F.3d at 998. In light of *Hill* and *Campa*, we are hard pressed to describe as unreasonable the state court's decision here that Ledford failed to demonstrate a prima facie case.

15

Notably, the same precedents also make clear that the inference of discrimination is weakened where, as here, the state accepts jurors in the allegedly targeted group. That the state accepted female jurors, even in small numbers, where a different allocation of strikes could have reduced female participation even further, tends to undermine the inference that those women who were peremptorily excluded were targeted on account of their gender. *See Hill*, 643 F.3d at 838 (observing that "[t]he final jury of 18 (12 plus six alternates) included nine (50%) blacks" but could have included as few as "four (22%) black[]" members "[i]f the government had exercised all of the strikes it could against black venire members"); *Campa*, 529 F.3d at 998 (noting that "the jury included three black jurors and an alternate black juror," which demonstrated that "the government did not attempt to exclude as many black persons as it could"). Although fewer women—two female jurors with two female alternates—remained on Ledford's jury than black jurors in either *Hill* or *Campa*, the same principle applies because the floor on female jurors was lower here. If the prosecution had used all of its strikes against women, it could potentially have achieved an all-male jury. In total, the state accepted six female jurors and three female alternates, but the defense struck four and one, respectively, leaving the four who served (two jurors and two alternates). Moreover, the prosecution accepted the very first prospective female juror. Although none of these observations conclusively demonstrates the absence

16

of discrimination, the overall pattern belies an intent to discriminate, and the burden to make out a prima facie case lies with the party claiming discrimination—here, Ledford.

Even if we were free to review the state courts' decisions de novo, our precedent would counsel affirmance. The proper disposition is even clearer under § 2254(d)'s exceedingly deferential standard. We cannot grant habeas relief unless the state court's application of the burden-shifting framework was "unreasonable"—that is, unless it was an application that "no fairminded jurist" could endorse. *Sealey*, 954 F.3d at 1354. Here, the Georgia Supreme Court correctly applied the well-established burden-shifting framework, noting—much as we have—that the statistical disparities to which Ledford pointed were insufficient to establish a prima facie case absent "additional facts which may give rise to an inference of discriminatory purpose." *Ledford*, 709 S.E.2d at 253 (quotation omitted). The Georgia court's determination that Ledford failed to make prima facie case is at the very least not unreasonable.[5]

---

[5] At oral argument, Ledford relied heavily on the fact that the prosecution attempted to strike one additional woman from serving as an alternate. That may be a wrinkle not squarely addressed in our existing precedent, but it does not change the result here. Even if the prosecution had successfully struck another female juror, it would not make this case significantly different from our existing case law. It certainly does not change the circumstances enough to make the state court's application of *Batson* and *J.E.B.* (or any other Supreme Court precedent) unreasonable. Moreover, when the government realized that it had fewer strikes available for removing alternates at the time, it withdrew its attempt to strike the female alternate juror *in favor of striking the next alternate juror—a man.* If anything, this pattern of behavior indicates that the government was not trying to reduce the number of women on the jury. Had that been the

17

Ledford is not entitled to habeas relief based on the prosecution's use of peremptory strikes.

## B

Ledford next argues that the state habeas court unreasonably applied clearly established federal law when it declined to find that his trial counsel rendered constitutionally ineffective assistance during the penalty phase of his trial. Ledford argues—and at the state evidentiary hearing presented expert testimony—that "no competent capital defense attorney would ever pursue a diagnosis of ASPD or label his client a psychopath in mitigation of punishment." If that proposition were correct as a matter of law, Ledford may well have a viable ineffective-assistance claim under *Strickland*—because the record demonstrates as a matter of fact that defense counsel presented an ASPD diagnosis as part of their theory of defense. But the legal premise of Ledford's argument does not withstand scrutiny.[6]

"Under *Strickland*'s familiar two-part test, [a defendant] must show that counsel's performance (1) 'fell below an objective standard of reasonableness' and (2) 'prejudiced the defense.'" *Tharpe v. Warden*, 834 F.3d 1323, 1338 (11th Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "When a

---

government's intention, it would not have withdrawn a strike against the only woman that it knew the defendant had accepted.

[6] Because the Supreme Court of Georgia summarily denied Ledford a certificate of probable cause on this claim, we "look through" to state habeas court's order. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

habeas petitioner in state custody raises a *Strickland* claim in federal court, the commands of *Strickland* and § 2254(d) operate in tandem so that our review is 'doubly deferential.'" *Id.* (quoting *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam)).  We will thus grant relief only if the state habeas court *unreasonably* determined that trial counsel performed reasonably—*i.e.*, "where there is no possibility fairminded jurists could disagree," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), that defense counsel acted "outside the range of professionally competent assistance," *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1270 (11th Cir. 2020) (quotation omitted).

Insofar as Ledford argues for "a *per se* rule that a lawyer renders ineffective assistance by presenting evidence of an antisocial personality disorder for purposes of mitigation," his position is squarely foreclosed by *Morton v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1157, 1168 (11th Cir. 2012).  Ledford's argument comes perilously close to asking us to overrule *Morton*, which of course we cannot do.[7]

Although Ledford disclaims any reliance on a per se rule that presenting ASPD evidence in mitigation constitutes deficient performance, his expert squarely testified (as already noted) that "no competent capital defense attorney would ever pursue a diagnosis of ASPD or label his client a psychopath in mitigation of

---

[7] "We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision." *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998).

punishment." As a result, the thrust of his argument is in stark tension with *Morton*. There, we explained that whether to present such evidence is "uniquely a matter of trial strategy" because "a diagnosis of antisocial personality disorder" is "a double-edged sword" that has the potential either to harm or to help the defendant. *Morton*, 684 F.3d at 1168; *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Accordingly, Ledford must do more than just point to his trial counsel's use of ASPD evidence; he must explain why presenting ASPD evidence was unreasonable based on the particular circumstances of his case.

Ledford attempts such an explanation, but his arguments come up short. He contends that his trial counsel could have provided all the mitigating evidence of his awful upbringing—in Ledford's view, the strongest mitigating evidence available—without introducing any evidence from psychological experts at all. And he insists that the only cost of avoiding psychological experts would have been losing out on flimsy evidence of Ledford's childhood brain damage. He further argues, most importantly, that his preferred strategy would have prevented the prosecution from bringing up Ledford's psychological condition at all because Georgia law precludes such evidence unless the defendant first opens the door to it.

Even accepting Ledford's premises uncritically—*i.e.*, assuming (1) that trial counsel could have prevented any testimony about his psychological state by declining to put on the ASPD evidence and (2) that beyond the diagnosis itself, he would have sacrificed only the evidence of childhood brain injury—Ledford has failed to demonstrate that his trial counsel's preferred strategy "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Competent trial counsel could have reasonably concluded that presenting the theory that childhood brain injuries gave Ledford ASPD was worth opening the door to additional psychopathy evidence. Ledford's crime was heinous and shocking—the kind of thing that a troubled childhood alone, no matter how extreme, might not be enough to excuse in the minds of a jury. Defense counsel could have reasonably concluded that brain damage, no matter how proven, might provide an avenue for escape that no amount of childhood abuse or suffering could provide—an excuse that could, in the minds of jurors, eliminate Ledford's responsibility for his appalling crime.

Let us elaborate. Defense counsel could have reasonably concluded that it would be difficult for a jury to imagine that any amount of abuse or personal suffering could sufficiently explain what Ledford did—lie in wait to rape a stranger only to beat her to death when she resisted. Such conduct speaks to a dispassionate plan for personal gratification with no thought of the cost to be borne

21

by the innocent who became his target—not the kind of crime that a troubled upbringing could satisfactorily explain. Counsel could also have reasonably concluded that Ledford's best (or only) hope to avoid the death penalty was an explanation of his crimes that undermined his *agency* in that heinous act, rather than merely partially undermining his culpability. Counsel could also have reasonably concluded that brain injury might offer this kind of excuse—if a childhood fall, possibly in combination with chronic alcoholism, somehow turned Ledford into a "psychopath" then his crimes could be seen as the product of a disability beyond his control. *Cf. Morton*, 684 F.3d at 1169 (explaining that counsel "could have reasonably decided that [expert] testimony was necessary to explain *why* Morton's childhood mitigated his moral culpability for the murders" (emphasis added)). Accordingly, even a purportedly flimsy case of brain damage might reasonably have attracted Ledford's counsel more than a straightforward troubled-childhood strategy.

And while it is true that ASPD can be aggravating rather than mitigating,[8] trial counsel here could have reasonably concluded that linking ASPD to an injury

---

[8] We have often recognized, in the context of rejecting ineffective-assistance claims in which a defendant faulted his trial counsel for failing to present evidence of ASPD, that such evidence is often more aggravating than mitigating. *See Weeks v. Jones*, 26 F.3d 1030, 1035, n.4 (11th Cir. 1994) (noting, in dicta, based on out-of-court precedent, that "[a]ntisocial personality disorder has been held not to be mitigating as a matter of law"); *Reed v. Sec'y, Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010) (holding that a "diagnosis—that Reed had an antisocial personality disorder and narcissistic personality disorder—was more harmful to Reed than mitigating"); *Cummings v. Sec'y, Fla. Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009) (describing "a

sustained when the defendant was an innocent child could ameliorate any aggravating effect the diagnosis might have had and transform it into a mitigating factor. The defense did not present ASPD as mitigating on its own but emphasized its theory that Ledford's ASPD was the result of brain injury sustained through no fault of his own. This judgment, too, was reasonable.

Maybe Ledford is right, in retrospect, that his trial counsel's strategy was not the best one—and that the course he now outlines would have given him a better chance at avoiding a death sentence. Maybe not. But even if Ledford is right, trial counsel's strategy was not unreasonable, especially in light of our clear holding in *Morton* that ASPD evidence can be mitigating in certain circumstances. We would hesitate to hold that Ledford's counsel acted deficiently even if we were at liberty to review the state courts' decisions de novo. Once again, that outcome is even clearer considering the second layer of AEDPA deference—deference to the Georgia state habeas court. That court concluded that Ledford's representation was sufficient after an extremely thorough examination of trial proceedings—indeed, its summary of the proceedings occupied half of the court's 70-page order.

---

diagnosis of antisocial personality disorder" as "not mitigating but damaging"); *Evans v. Sec'y for the Dep't of Corr.*, 703 F.3d 1316, 1332 (11th Cir. 2013) (explaining that "we have held consistently" that evidence of "antisocial personality disorder" is "potentially aggravating" because it "is a trait most jurors tend to look disfavorably upon, that is not mitigating but damaging" (quotations omitted)); *see also Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1349 (11th Cir. 2010).

Moreover, that court diligently applied the *Strickland* standard and concluded that

trial counsel's strategy was not deficient, relying heavily on *Morton*, which, as we

have explained, provides the proper frame of analysis. We are certainly not

prepared to call an analysis so similar to our own an "unreasonable application" of

*Strickland* that "no fairminded jurist" could endorse. *Sealey*, 954 F.3d at 1354.

We cannot, therefore, disturb the state habeas court's conclusion that trial

counsel's performance was not deficient, and we have no need to consider whether

counsel's actions prejudiced Ledford's defense. No relief is due to be granted on

this point.

## C

## 1

We now turn to Ledford's final claim for relief—Ridarick's alleged juror

misconduct. For the first time before the state habeas court, Ledford proffered

evidence of Ridarick's May 2009 online comments, which were posted soon after

the verdict was returned, and argued that they contradicted Ridarick's sworn

statements at voir dire. As Ledford reads the posts, they demonstrate Ridarick's

belief that the death penalty is the only just sentence for malice murder. Ledford

points out that at voir dire Ridarick stated that he could and would consider all

possible sentencing options for a person convicted of malice murder. Accordingly,

Ledford says, the posts prove that Ledford lied at voir dire and, in fact, was set on

the death penalty from the outset—which, Ledford argues, violated his constitutional right to an impartial jury.

The state habeas court didn't reach the merits of this claim but instead disposed of it on procedural grounds, concluding that Ledford had defaulted it by failing to raise it on direct appeal.[9]  When a state court determines that a claim was defaulted on procedural grounds, we will review it on the merits "only in two narrow circumstances."  *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003).  A petitioner must show either (1) "'cause' for the default and actual 'prejudice' resulting from the default" or (2) a "fundamental miscarriage of justice"—*i.e.*, that "a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Id.*

Ledford does not contend that he is actually innocent, so we focus here on cause and prejudice.  "To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  "We have . . . determined that an ineffective-assistance-of-counsel claim . . . may constitute cause"—but only, and importantly, as we explain below, if it is "both exhausted and not procedurally defaulted."  *Ward*, 592 F.3d at 1157.  "To establish 'prejudice,' a

---

[9] *See supra* at 19 n.7.

petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different" if he had been allowed to raise the issue in state court. *Henderson*, 353 F.3d at 892.

Ledford argues that the ineffective assistance of his appellate counsel establishes cause for his default.[10] Specifically, he contends that his appellate counsel were deficient in failing to investigate Ridarick's social media activity during his direct appeal. Ledford's cause argument fails because he failed to timely raise it.

Before a habeas petitioner can rely on an allegation of ineffective assistance of counsel to demonstrate cause to excuse a procedural default, he must show that he properly raised the argument in state court, because ineffective assistance is itself a constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 452 (2000)

---

[10] At oral argument, Ledford's counsel expressly disclaimed any reliance on any cause argument of the type that the Supreme Court recognized in *Williams v. Taylor*, 529 U.S. 420 (2000), and underscored that Ledford relies *solely* on ineffective assistance of appellate counsel to show cause to excuse his default. 529 U.S. at 442 (indicating that a "trial record" that "contains no evidence which would have put a reasonable attorney on notice that" a juror had answered dishonestly at voir dire can "establish cause" for a procedural default committed by failing to timely object to the juror dishonesty). With respect to *Williams*, Ledford argues only that it shows why any failure to develop the record in the state habeas court was not due to lack of diligence on his part and why he should therefore have been given an evidentiary hearing, an issue that we address below. Even if Ledford hadn't disclaimed any reliance on the kind of cause identified in *Williams*, Ledford failed to argue that particular cause argument before the district court, and we needn't allow him to raise the argument now. *See Ochran v. United States*, 117 F.3d 495, 502–03 (11th Cir. 1997) (explaining that we may hold a position forfeited before the district court even where the opposing party fails to raise the forfeiture argument to us).

26

("A claim of ineffective assistance . . . must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." (alteration adopted) (internal quotation marks omitted)); *see also Ward*, 592 F.3d at 1157 ("We have . . . determined that an ineffective-assistance-of-counsel claim, *if both exhausted and not procedurally defaulted*, may constitute cause." (emphasis added)).  Because Ledford did not properly raise his ineffective-assistance-of-appellate-counsel claim in state court, he has failed to exhaust (and thus cannot now press) his only argument for cause.

Before the state habeas court, Ledford provided only hints of the argument he now advances—insufficient to exhaust and preserve it.  In two footnotes in his initial state habeas petition, Ledford stated (1) that "[t]o the extent that Petitioner's counsel failed to protect Petitioner's rights in this regard, counsel's performance was unreasonably deficient, and Petitioner was prejudiced by the deficiencies," and (2) that "[t]o the extent that Petitioner's counsel failed to argue, develop, or present these issues, failed to adequately preserve objections thereto, or failed to effectively litigate these issues on direct appeal, Petitioner's counsel rendered ineffective assistance, and Petitioner was prejudiced thereby."

Both footnotes referred generally to a collection of vaguely worded allegations of jury misconduct in the body of the petition, all of which Ledford has since abandoned, save for his allegation that Ridarick lied at voir dire.  But

27

nowhere before the state habeas court did Ledford argue that his appellate counsel performed deficiently by failing to challenge Ridarick's conduct in particular, let alone how or why his appellate counsel were deficient in that connection. And in his application for a certificate of probable cause to the Supreme Court of Georgia, Ledford did not so much as mention an argument that his appellate counsel were ineffective. He just baldly asserted that he could prove cause and prejudice to overcome the default of his juror-misconduct claims if he were given an evidentiary hearing.

Such general, conclusory statements are insufficient to preserve a claim for federal habeas review. *See Kelley v. Secretary for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) ("[H]abeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way."). We have held that "[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) (quoting *Kelley*, 377 F.3d at 1345). Ledford's "references to federal law in his state habeas proceedings are exactly the type of needles in the haystack that we have previously held are insufficient to satisfy the exhaustion requirement." *Id.* And because "a cause and prejudice argument which is not presented in state court is itself procedurally defaulted,"

28

Ledford cannot raise it "for the first time on federal habeas" unless he can show "cause and prejudice for that particular default as well." *Fults v. GDCP Warden*, 764 F.3d 1311, 1317-18 (11th Cir. 2014).[11]

But Ledford makes no argument that he can show cause and prejudice sufficient to excuse the default of his ineffective-assistance-of-appellate-counsel-based cause argument. Instead, he simply asserts—wrongly, as we have explained—that he sufficiently preserved his ineffective-assistance-of-appellate-counsel claim by means of his passing mentions in state habeas filings. And because Ledford cannot establish cause or prejudice to excuse the default of his ineffective-assistance-of-appellate-counsel claim, that claim cannot serve as cause to excuse the default of his juror-misconduct claim. In short, Ledford has failed to exhaust—and thus has procedurally defaulted—his only argument for overcoming the original procedural default. Accordingly the district court did not err in denying his claim of juror misconduct.

---

[11] Strictly speaking, failing to raise an argument in state court is an exhaustion problem, not a procedural default. But "[a] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Henderson*, 353 F.3d at 898–99 (quoting *Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991)). Georgia law generally bars successive habeas petitions, treating claims not raised in an initial petition as procedurally defaulted. *See Gibson v. Head*, 646 S.E.2d 257, 259 (2007); *see also* Ga. Code Ann. § 9-14-51 ("All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition. Any grounds not so raised are waived . . . .").

**2**

Ledford's request for an evidentiary hearing fails as well, and for similar reasons. As already explained, Ledford requested a hearing for two reasons: (1) to further develop his juror-misconduct claim on the merits and (2) to allow him to present evidence of cause and prejudice. Before us, Ledford contends, as he argued to the district court, that his appellate counsel's deficient performance provides cause and that his claim is strong enough to establish prejudice, and, therefore, that he should have been allowed to present the evidence of juror misconduct that the state habeas court never heard—testimony that he says will establish that Ridarick lied at voir dire. Separately, he contends that even if the evidence currently in the record does not establish cause and prejudice for his default, he should have been allowed a hearing to produce additional evidence. The district court denied his requests.

When a habeas petitioner seeks a hearing in federal court, the court must first determine "whether the prisoner was diligent in his efforts" to develop the facts in state court. *Williams v. Taylor*, 529 U.S. 420, 435 (2000). If he was not diligent, he must satisfy the conditions of § 2254(e)(2). *Id.* That provision requires a showing that

> (A) the claim relies on, (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due

diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). If, on the other hand, the petitioner was diligent, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

Separately, "[w]hen a petitioner asks for an evidentiary hearing" specifically on the issues of cause and prejudice, "neither section 2254(e)(2) nor the standard of cause and prejudice that it replaced apply." *Henry v. Warden, Ga. Diagnostic Prison*, 750 F.3d 1226, 1231–32 (11th Cir. 2014). Rather, "[w]hen a petitioner has requested an evidentiary hearing on the procedural default of a substantive claim, we need ask only whether the district court abused its discretion when it denied an evidentiary hearing on that issue." *Id*. at 1332.[12]

---

[12] The district court here seemingly denied Ledford a merits hearing based on a mistaken understanding of the law, requiring *both* a showing of diligence under *Williams* and satisfaction of the 28 U.S.C. § 2254(e)(2) test, whereas *Williams* actually allows a *diligent* litigant to bypass (e)(2) when seeking a merits hearing. And although the district court did not separately address the propriety of a cause-and-prejudice hearing as opposed to a merits hearing, it ultimately concluded that Ledford was "not entitled to an evidentiary hearing under the standard discussed above"—apparently applying the same standard to both types of hearing. The district court thus applied the wrong standard with respect to both merits and cause-and-prejudice hearings. Because the district court made an error of law, we cannot defer to its decision under the abuse-of-discretion standard as we ordinarily would when reviewing a decision to deny a hearing. *See Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351 (11th Cir. 2008) ("An error of law is *per se* abuse of discretion.").

31

Without deciding whether or not Ledford pursued his juror-misconduct claim diligently below, we affirm the district court's refusal to conduct a hearing, either to develop the merits or to investigate cause and prejudice. Any merits hearing would have been futile because it is plain that Ledford could not prove the petition's factual allegations. *See Schriro*, 550 U.S. at 474 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether the hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Specifically, there is no way an evidentiary hearing could allow Ledford to overcome procedural default—as the district court correctly held, he failed to exhaust his ineffective-assistance-of-appellate-counsel-based cause argument. As already explained, that argument was the only cause for default that Ledford has presented in federal court, and without it he cannot overcome the procedural bar on his juror-misconduct claim.

Ledford's requested cause and prejudice hearing would have been similarly futile. Although Ledford requested a hearing in part to show cause and prejudice as to his juror-misconduct claim, he failed to request a hearing to show cause and prejudice with respect to his ineffective-assistance-of-appellate-counsel-based cause argument—or, indeed, even argue that he could show cause and prejudice as to that claim. As we have explained, he merely argues, wrongly, that he exhausted the claim properly. With his only argument to show cause itself procedurally

32

barred, a hearing on cause and prejudice would have been futile; both we and the district court would be procedurally barred from finding Ledford's appellate counsel ineffective, no matter what evidence he adduced at the hearing. Accordingly, vacating and remanding to the district court to allow it to apply the proper standards for evidentiary hearings would serve no purpose; Ledford cannot ultimately prevail, in any event.

## III

The district court correctly concluded that Ledford is not entitled to federal habeas relief. We cannot say that the Georgia courts unreasonably decided Ledford's jury-selection and ineffective-assistance claims. And Ledford procedurally defaulted his juror-misconduct claim in state court, and he cannot show cause to excuse that default because his only cause argument—ineffective assistance of his appellate counsel—itself was not properly exhausted in state court. That failure precludes any relief, no matter what Ledford might have been able to prove in an evidentiary hearing. As result, we also affirm the district court's decision to deny the hearing.

**AFFIRMED.**